529 F.2d 1080
 I.T.O. CORPORATION OF BALTIMORE, Employer, and Liberty
Mutual Insurance Company, Carrier, Petitioners,
v.
BENEFITS REVIEW BOARD, U.S. DEPARTMENT OF LABOR, Respondent,
William T. Adkins, Respondent,
International Longshoreman's Association, Amicus Curiae.
MARITIME TERMINALS, INC., and Aetna Casualty and Surety Co.,
Petitioners,
v.
SECRETARY OF LABOR, and Donald D. Brown, Respondents.
MARITIME TERMINALS, INC., and Aetna Casualty and Surety Co.,
Petitioners,
v.
Vernie Lee HARRIS, and United States Department of Labor,
Respondents.
NATIONAL ASSOCIATION OF STEVEDORES et al., Petitioners,
v.
BENEFITS REVIEW BOARD, U.S. DEPT. OF LABOR, Respondent,
William T. Adkins, Respondent.
 Nos. 75--1051, 75--1075, 75--1196 and 75--1088.
 United States Court of Appeals,
Fourth Circuit.
 Argued Aug. 21, 1975.
Decided Dec. 22, 1975.
 
 David R. Owen, Baltimore, Md. (Francis J. Gorman, Semmes, Bowen & Semmes, Baltimore, Md., on brief), for I.T.O. Corp. of Baltimore and Liberty Mutual Ins. Co.
 Donald A. Krach, Niles Barton & Wilmer, Baltimore, Md. (Paul B. Lang, William C. Stifler, Baltimore, Md., Thomas D. Wilcox, Washington, D.C., on brief), for National Ass'n of Stevedores.
 Amos I. Meyers, Baltimore, Md. (Terry Paul Meyers, Baltimore, Md., on brief), for William T. Adkins.
 Thomas W. Gleason, Jr. (Herzl S. Eisenstandt and Richard H. Kapp, on brief), amicus curiae for Intern. Longshoremen's Ass'n, AFL-CIO.
 George M. Lilly, Atty., Washington, D.C. (William J. Kilberg, Sol. of Labor, Marshall H. Harris, Associate Sol., and Karen L. Gilbert, Atty., U.S. Dept. of Labor, on brief), for Director, Office of Workers' Compensation Programs.
 John B. King, Jr., Norfolk, Va. (Walter B. Martin, Jr., Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for petitioners, Maritime Terminals, Inc. and Aetna Cas. and Sur. Co.
 Charles S. Montagna, Norfolk, Va. (Breit, Rutter & Montagna, Norfolk, Va., on brief), for respondents, Donald D. Brown and Vernie Lee Harris.
 Linda L. Carroll, Atty., U.S. Dept. of Labor (William J. Kilberg, Sol. of Labor, Laurie M. Streeter, Acting Associate Sol., and George M. Lill, Atty., U.S. Dept. of Labor, on brief), for Director, Office of Workers' Compensation Programs.
 Before HAYNSWORTH, Chief Judge, and WINTER and CRAVEN, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 These appeals present the question of first impression of the extent to which the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., extend benefits under the Act to persons engaged in necessary steps in the overall process of loading and unloading a vessel, but who, prior to the Amendments, could claim benefits for accidental injury or death only under state law. The Administrative Law Judge and the Benefits Review Board of the Department of Labor held that benefits under the Act had been extended to all persons handling cargo or performing related functions in the terminal area. We disagree, and reverse each of the three awards in these cases.
 
 
 2
 We conclude that the Act's benefits extend only to those persons, including checkers, who unload cargo from the ship to the first point of rest at the terminal or load cargo from the last point of rest at the terminal to the ship. While the 1972 Amendments do extend the benefits of the Act to some persons who were not previously eligible, coverage is limited by the concept of 'maritime employment,' and not every person handling cargo between ship and point of discharge to the consignee or point of receipt from the shipper is engaged in 'maritime employment.' On the facts we conclude that these three claimants were not. The 1972 extension of coverage was intended only to remove inequities and anomalies arising when a person otherwise engaged in 'maritime employment' was injured on land.
 
 
 3
 A subsidiary question in Nos. 75--1051 and 75--1088 is raised by the motion of Benefits Review Board, Department of Labor, to substitute the Director, Office of Workers' Compensation Programs, Department of Labor, as to which is the proper respondent in a petition to review under 33 U.S.C. § 921(c). We think that neither is a proper party to the proceedings. We therefore deny the Board's motion to substitute, and dismiss the Board. We will treat the Director as amicus curiae.
 
 I.
 
 4
 The awards presented for review were made to William T. Adkins, who was injured at Dundalk Marine Terminal in the Port of Baltimore, and to Donald D. Brown and Vernie Lee Harris, both of whom were injured at Marine Terminals, Inc., the lessee and operator of Norfolk International Terminals in Norfolk, Virginia.
 
 
 5
 A. Adkins was a forklift operator and he sustained his injuries while he was moving a load of brass tubing from its storage place in a warehouse to a waiting delivery truck which would transport it to its ultimate destination. He performed a function in the overall unloading of the ship and discharge of its cargo from the terminal. The tubing had arrived at the terminal some seven days earlier aboard the SS American Legend, packed in a container. The container had been removed from the vessel and immediately taken from the ship's side to a marshaling area one-half to three-quarters of a mile away where it was stored with other containers. The ship sailed on the same day that it had docked. Three days later the container was moved 1,000--1,200 feet to a warehouse or transit shed, known as Shed 11, where the container was 'stripped,' i.e., unloaded, and the brass tubing stored to await transportation to its destination. The delivery truck did not arrive until four days later, and shortly thereafter Adkins was injured loading the tubing into it with his forklift.
 
 
 6
 Shed 11 was 685 feet from the water's edge. It was not connected geographically or functionally with the ships' berthing area, and ships were neither loaded nor unloaded from it.
 
 
 7
 B. Brown suffered carbon monoxide poisoning while he was engaged as a forklift operator at Marine Terminals. He performed a function in the overall loading of cargo on board a ship. He operated his forklift in a warehouse where cotton piece goods and barrels of chemicals had been deposited after delivery by truck or rail. His job was to move loads of these items from their storage place to a container which was then 'stuffed,' i.e., loaded with the items he had moved.
 
 
 8
 After a container was fully loaded, it was sealed and moved by another vehicle, called a 'hustler,' to a marshaling area adjacent to the pier. The container would then be lifted from the 'hustler' and placed in a stack with other containers to await the arrival of a ship. When the ship arrived the container would be loaded aboard. Brown took no part in these latter operations. They were performed by persons other than employees of Marine Terminals. At no time was Brown required to board a ship. The warehouse in which he worked was 850 feet from the water's edge.
 
 
 9
 C. Harris was injured when the brakes failed on a 'hustler' which he was operating and it collided with a container. He, too, performed a function in the overall loading of a ship; his was the next after that performed by Brown. Harris moved containers from the longterm container storage area to the container marshaling area adjacent to the pier. He had just deposited a container at the container marshaling area and was on the return trip to the long-term container storage area to pick up another container when his brakes failed. No ship was present at the pier at the time, and the containers in the marshaling area were not scheduled to be loaded aboard a vessel until later in the day when one was scheduled to arrive.
 
 II.
 
 10
 The awards were made under § 3(a) of the Act, 33 U.S.C. § 903(a) (1975 Supp.), which, in pertinent part and with italics to show the Amendments made in 1972, provides:
 
 
 11
 Compensation shall be payable . . . in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). . . .
 
 
 12
 The meaning of the words 'employee' and 'employer' is found in § 2(3) and (4), 33 U.S.C. § 902(3) and (4) (1975 Supp.), and these subsections, with italics to show the 1972 Amendments, provide:
 
 
 13
 (3) The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.
 
 
 14
 (4) The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).
 
 
 15
 Prior to 1972,[1] benefits were payable under the Act to any person (except a master or member of a crew or a person loading or unloading a vessel under eighteen tons net) if he was injured 'upon the navigable waters of the United States (including any dry dock) and if recovery for the disability through workmen's compensation proceedings (could) not validly be provided by State law,' with certain exceptions not material here. The pre-1972 Act thus did not distinguish among employees depending on the function they performed. Instead, the geographical location of the injury was all-important, with coverage stopping at the water's edge.
 
 
 16
 Sections 2 and 3 of the present Act establish a dual test for coverage. The situs requirement has been retained, with the definition of 'navigable waters' expanded to include certain specified land areas. In addition, a new 'status' test has been added: the person injured ('employee') must have been engaged in 'maritime employment,' a concept which is nowhere defined but which includes 'longshoring operations.' The net effect of the 1972 Amendments was therefore to broaden the area in which an injury would be covered, and narrow the class of persons eligible according to job function.
 
 
 17
 Section 4 of the amended Act, 33 U.S.C. § 904, limits liability for compensation to an 'employer' as defined in § 2(4), 33 U.S.C. § 902(4). The definition is so drafted that it appears that an employer will always be liable for his 'employees" covered injuries. It therefore does not prescribe another, additional test for coverage.
 
 III.
 
 18
 We have no doubt that each of the claimants satisfies the situs test of the post-1972 Act. As a minimum, they were injured at a terminal, adjoining navigable waters, used in the overall process of loading and unloading a vessel. The difficult issue is whether they also satisfy the status test--were they engaged in 'maritime employment,' or may they be deemed longshoremen or persons engaged in longshoring operations within the meaning of the Act?
 
 
 19
 The meaning of the terms 'maritime employment,' 'longshoreman' and 'persons engaged in longshoring operations' is not so fixed and certain that the Act alone provides the answer. 'Maritime employment' is a phrase that embodies the concept of a direct relation to a vessel's navigation and commerce. Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 61, 34 S.Ct. 733, 735, 58 L.Ed. 1208 (1914) ('The libellant was injured on a ship, lying in navigable waters, and while he was engaged in the performance of a maritime service. We entertain no doubt that the service in loading and stowing a ship's cargo is of this character.') Ordinarily the question of whether a person was engaged in 'maritime employment' is to be determined as of 'the time of the accident.' Parker v. Motor Boat Sales, 314 U.S. 244, 247, 62 S.Ct. 221, 86 L.Ed. 184 (1941). See Pennsylvania R.R. v. O'Rourke, 344 U.S. 334, 340, 73 S.Ct. 302, 97 L.Ed. 367 (1953). But while the cases establish that loading and unloading a vessel is maritime employment, they all limited recovery to injuries sustained on the seaward side of the water's edge because such was the limit of admiralty jurisdiction. See discussion and collection of authorities in Victory Carriers, Inc. v. Law, 404 U.S. 202, 204--07, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). Thus, the cases shed no real light on how far shoreward the maritime nature of loading and unloading extends, particularly where, as here, the shore-based aspects of the overall loading and unloading operations have been split into numerous functions and assigned to different employees.
 
 
 20
 'Longshoreman' and 'longshoring operations' are words of no greater exactness of meaning. It is true that in Intercontinental Container Transport Corp. v. New York Shipping Ass'n, 426 F.2d 884 (2 Cir. 1970), it was said that '(h) istorically the work of longshoremen included the preparation of cargo for shipment by making up, for example, drafts and pallets and, in connection with unloading cargo, the breaking up of drafts and pallets, sorting the cargo according to its consignees and delivering it to the trucks or other carriers.' Id. at 886. At the same time, however, the opinion recognized that '(t)he work of stevedores is the loading and unloading of ships,' id. at 889. The case dealt with a freight forwarder's complaint that an agreement between a longshoremen's union and a steamship carriers' association, which foreclosed the forwarder's employees from stuffing and stripping containers, constituted a restraint of trade. The decision is hardly determinative of just what functions a longshoreman performs and at what point in the unloading and loading processes, if any, he ceases to perform longshoring operations.
 
 
 21
 Perhaps more significant is the fact that the Secretary of Labor, in promulgating regulations to foster safe conditions in the longshoring industry, defined 'longshoring operations' as the 'loading, unloading, moving, or handling of, cargo, ship's stores, gear, etc., into, in, on, or out of any vessel on the navigable waters of the United States.' 29 C.F.R. § 1918.3(i) (1974) (emphasis added). See 29 C.F.R. § 1910.16(b)(1) (1974). Of course these regulations were adopted prior to enactment of the 1972 Amendments and it may well be, as the government argues, that they will ultimately be redrafted when the scope of the 1972 Amendments has been judicially determined. They are significant evidence, however, of the meaning attached to the words at the time that Congress was considering the 1972 Amendments.
 
 
 22
 Because we conclude that the terms 'maritime employment,' 'longshoreman' and 'longshoring operations' are not such words of art that we would be justified in deciding the case without resort to the legislative history of the 1972 Amendments and full consideration of the context in which they were enacted, we turn to these secondary sources. See United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961).
 
 IV.
 
 23
 The Act was initially adopted in 1927 as a congressional response to a series of holdings that the states were without power to afford a workmen's compensation remedy to workers aboard vessels, and that Congress lacked the authority to validate the application of state remedies to such workers, Southern Pac. Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917); Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920); Washington v. W. C. Dawson & Co., 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924). The rationale of those cases was that under the Constitution only Congress had authority over longshoremen injured on the seaward side of the pier. Congress responded to the broad suggestion in Dawson, 264 U.S. at 227, 44 S.Ct. at 305, that Congress enact 'general provisions for compensating injured (maritime) employees . . .' by enacting the 1927 Act.[2]
 
 
 24
 Continuing problems in the application of the Act arose from the fact that it limited recovery to injuries occurring on navigable waters, i.e., it looked to the situs of the injury rather than to the maritime status of the injured longshoreman. See Nacirema Operating Co. v. Johnson, 396 U.S. 212, 215--16, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969). Specifically, Nacirema held that the Extension of Admiralty Jurisdiction Act, which extended admiralty jurisdiction to certain land structures, did not operate to modify the basic requirement of the Compensation Act that benefits be afforded solely on account of death or injuries not reachable by state workmen's compensation statutes, i.e., those beyond the pier on the seaward side. Such a holding necessarily resulted in anomalies, e.g., benefits were denied the three longshoremen in Nacirema who were injured or killed when cargo hoisted by the ship's crane swung back and knocked them to the pier or crushed them against the side of a railroad car, while the widow of a fourth longshoreman whose decedent had a similar accident but was knocked into the water and drowned was able to recover. (Her case was not taken to the Supreme Court.) See Marine Stevedoring Corporation v. Oosting, 398 F.2d 900 (4 Cir. 1968). See also the dissenting opinion of Chief Judge Haynsworth in Oosting commenting on incongruities in application of the Act, 398 F.2d at 911, and our opinion in Snydor v. Villain & Fassio et Compania Int. di Genova, 459 F.2d 365 (4 Cir. 1972), setting forth a number of ship-related but uncompensable injuries. Indeed, the Court in Nacirema apparently anticipated incongruous results stemming from its holding because it said:
 
 
 25
 There is much to be said for uniform treatment of longshoremen injured while loading or unloading a ship. . . . (C)onstruing the Longshoremen's Act to coincide with the limits of admiralty jurisdiction--whatever they may be and however they may change--simply replaces one line with another whose uncertain contours can only perpetuate on the landward side of the Jensen line, the same confusion that previously existed on the seaward side. While we have no doubt that Congress had the power to choose either of these paths in defining the coverage of its compensation remedy, the plain fact is that it chose instead the line in Jensen separating water from land at the edge of the pier. The invitation to move that line landward must be addressed to Congress, not to this Court. 396 U.S. at 223--24, 90 S.Ct. at 354.
 
 
 26
 See also Victory Carriers v. Law, 404 U.S. 202, 216, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971).
 
 
 27
 To the extent pertinent here, the 1972 Amendments were a direct response to the invitation in Nacirema. Given that Congress has the power to extend admiralty jurisdiction to the landward side of the Jensen line, we think that the most informative source on how far the line was extended is contained in the virtually identical House and Senate Reports, dealing with 'Extension of Coverage to Shoreside Areas.' U.S.Code Cong. & Admin.News 1972, p. 4707. See S.Rep. No. 92--1125, 92 Cong., 2d Sess. (1972); H.R.Rep. No. 92--1441, 92d Cong., 2d Sess. (1972). The pertinent portions of the House Report, 3 U.S.Code Cong. and Admin.News, pp. 4698, 4707--08 (92d Cong., 2d Sess. (1972)), are set forth in the margin.[3]
 
 
 28
 The committee's report starts with frank recognition that the Act, prior to amendment, embodied the Jensen rule: 'coverage of the present Act stops at the water's edge . . .. The result is a disparity in benefits . . . for the same type of injury depending on which side of the water's edge and in which State the accident occurs.' U.S.Code Cong. & Admin.News 1972, p. 4707.
 
 
 29
 The committee also recognized that the disparity was worsening, not only because of unrealistic limits on benefits and exemptions from coverage contained in state workmen's compensation law, but also because modern technology in the industry required 'more of the longshoreman's work . . . (to be) performed on land than heretofore.' The committee then stated its belief that 'the compensation payable to a longshoreman . . . should not depend on the fortuitous circumstance of whether the injury occurred on land or over water.' U.S.Code Cong. & Admin.News 1972, p. 4708.
 
 
 30
 With its premise thus established, the committee made a series of significant statements. It said its intent was to provide benefits to employees 'who would otherwise be covered by this Act for part of their activity' (emphasis added). As an example, it cited employees who unload cargo from a ship and transport it 'immediately . . . to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters.' U.S.Code Cong. & Admin.News 1972, p. 4708. Such employees were to be compensated if they were injured over navigable waters or on the adjoining land area. Conversely, employees not engaged in loading or unloading a vessel were not to be covered even if they were injured on land in an area used for such activity.
 
 
 31
 The report specifically stated that 'employees whose responsibility is only to pick up stored cargo for further transshipment would not be covered' (emphasis added), nor would purely clerical employees who do not participate in the loading and unloading of cargo. However, checkers 'directly involved in the loading and unloading functions' (emphasis added) would be eligible for benefits. U.S.Code Cong. & Admin.News 1972, p. 4708.
 
 
 32
 We especially note that the committee report is explicit in delineating the portion of the overall loading and unloading process during which coverage attaches to longshoremen and persons engaged in longshoring operations: the Act applies between the ship and, in the case of unloading, the first storage or holding area on the pier, wharf, or terminal adjoining navigable waters. Although the instance of loading a ship was not discussed, we think that the same principle controls in reverse: coverage is afforded from the last storage or holding area on the pier, etc., to the ship. We perceive the landward limit of coverage to be the 'point of rest' as that term is generally understood in the industry, Norfolk Marine Terminal Association Tariff, No. 1--C at 18, Item 290, Respondent's Exhibit 1, Harris v. Marine Terminals, Inc., No. 74--LHCA--108 (Aug. 15, 1974), and defined by the Federal Maritime Commission in its regulations governing terminal operators. 46 C.F.R. § 533.6(c)(1974). See also American President Lines, Ltd. v. Federal Maritime Bd., 115 U.S.App.D.C. 187, 317 F.2d 887, 888 (1962); DiPaola v. International Terminal Operating Co., 311 F.Supp. 685, 687 (S.D.N.Y.1970).
 
 
 33
 Applying these principles to the three cases at bar, we think that in Adkins' case the container marshaling area was the first point of rest in the unloading process, and that in Brown's and Harris's cases the marshaling area adjacent to the pier was the last point of rest in the loading process. Since Adkins was injured landward of the first point of rest[4] and Brown and Harris were injured landward of the last point of rest, we think it follows that none was afforded coverage under the Act, as amended.
 
 
 34
 It might be argued that the construction we place on the statute is inconsistent with the congressional committees' statements that the 1972 Amendments were intended to make eligible for benefits 'employees who would otherwise be covered by this Act (before amendment) for part of their activity' (emphasis added). U.S.Code Cong. & Admin.News 1972, p. 4708. It may well be that there are longshoremen engaged in moving cargo between ship and point of rest who never cross the water's edge. Such workers would not have been covered by the old Act, but will be eligible for benefits under our interpretation of the Amendments.
 
 
 35
 Our answer is that we have done no more than the committees. Although the committees said that coverage was being limited to employees who would be otherwise covered 'for part of their activity,' the committees clearly recognized that with modern technology 'more of the longshoreman's work is performed on land' U.S.Code Cong. & Admin.News 1972, p. 4708 and they unequivocally stated that they intended to cover employees who unload the ship and immediately transport the cargo to a storage or holding area (point of rest) on the pier, wharf or terminal, excluding coverage only to those who pick up stored cargo for further transshipment. In view of the latter statements and the liberality of construction to be afforded remedial legislation of this type, we do not feel constrained to give an overly limiting interpretation to the phrase 'employees who would otherwise be covered by this Act for part of their activity.' U.S.Code Cong. & Admin.News 1972, p. 4708.
 
 
 36
 In summary, when we examine the amendments in the context of the Act prior to amendment, the case law construing the Act and commenting on the power of Congress to legislate in this area, and the language of the committee reports, we reject the government's assertion that all persons, excluding clerical employees other than checkers, who play any part in the overall loading and unloading process are covered by the Act as amended. We think that, with respect to longshoremen or other persons engaged in longshoring operations, the Amendments extend only to those employees engaged in loading and unloading activities between the ship and the first (last) point of rest, including checkers 'directly involved in (such) loading or unloading functions.' U.S.Code Cong. & Admin.News 1972, p. 4708.
 
 V.
 
 37
 In the posture in which Nos. 75--1051 and 75--1088 came to our court, the Benefits Review Board, Department of Labor, was named as respondent in a petition under § 21(c) of the Act, 33 U.S.C. § 921(c) (1975 Supp.), to review the Board's order awarding benefits. The claimant, William T. Adkins, was also named as a respondent. In due course the Board moved that it be dismissed from the proceedings and that there be substituted as a respondent the Director, Office of Workers' Compensation Programs. The claimant did not oppose the motion, but petitioners, I.T.O. Corporation of Baltimore and Liberty Mutual Insurance Company, and the intervenors, National Association of Stevedores et al., did oppose it. We deferred decision on the motion until decision of the cases.
 
 
 38
 In agreement with the holding and reasoning of McCord v. Benefits Review Bd., 168 U.S.App.D.C. 302, 514 F.2d 198 (1975), we do not think that the Benefits Review Board is a respondent to a petition to review its order under either 33 U.S.C. § 921(c) or Rule 15(a), F.R.A.P. The same result has been reached by the Ninth Circuit in two unreported cases. Westfall v. Benefits Review Board (Nos. 73--2578 and 73--2579, 9 Cir. Dec. 5, 1973); Walker v. Benefits Review Board (Nos. 74--1340 and 74--1494, 9 Cir. Aug. 9, 1974). As the District of Columbia Circuit held, 'there is sufficient adversity between (employer and employee) to insure proper litigation without participation by the Board,' 514 F.2d at 200, and on this reasoning we do not think that the Director, Office of Workers' Compensation Programs is a proper respondent either. We dismiss the Board and deny the substitution. This, of course, is not to say that either the Board or a court of appeals may not, in a proper case, permit intervention by others who have an interest at stake and that they may not appear as petitioners or respondents as their interests appear.
 
 
 39
 Counsel for the government have performed a valuable service in these cases by supplementing the argument of the claimants as to the meaning to be afforded the 1972 Amendments. We treat their participation, however, as amicus curiae.
 
 
 40
 In Nos. 75--1075 and 75--1196, no point is made of who are named as respondents. We make none, confident in the belief that in this circuit future litigation will be conducted in accordance with what we have stated.
 
 
 41
 Reversed; Benefits Review Board dismissed in Nos. 75--1051 and 75--1088.
 
 CRAVEN, Circuit Judge (dissenting):
 
 42
 William T. Adkins, Donald D. Brown, and Vernie Lee Harris will, I think, be surprised to learn that they are not longshoremen, and astonished to discover that they are not engaged in maritime employment of any kind. If they are not, as my brothers hold, then the Congress has labored prodigiously only to have accomplished nothing at all in its effort to simplify the problems of maritime workers' compensation. While these cases are the first to reach a court of appeals under the 1972 amendments to the Act,[1] they will surely not be the last. Henceforth, injured employees and their counsel must comb the waterfronts of this circuit, probing hopelessly, like Diogenes with his lantern, for that elusive 'point of rest' upon which coverage depends. I decline to make that search, and would hold that these plaintiffs and others like them are covered by the Act as amended.
 
 I.
 
 43
 In general I agree with Part II of the majority opinion. The gist of the amended Act is that for a person to be eligible for compensation he must have been injured on the 'navigable waters' of the United States (as redefined by the Act) and that at the time of his injury he must have been an 'employee.'
 
 
 44
 I agree with my brothers that Adkins, Brown, and Harris were injured while upon the 'navigable waters' of the United States as that term has been expanded by the 1972 amendments.
 
 
 45
 Since plaintiffs satisfy the 'situs' test, the only remaining inquiry is whether or not they had the proper 'status,' i.e., were they 'employees' within the meaning of § 902(3) of the amended Act. If they were, then both requirements for coverage are met, and they are entitled to recover.
 
 II.
 
 46
 To be 'employees' within the meaning of the Act, plaintiffs must fall within § 902(3), which provides:
 
 
 47
 (3) The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, . . ..
 
 
 48
 The critical term is 'maritime employment.'[2] That term is used by the Congress generically--a broad term that is said to include the narrower terms: 'longshoreman,' 'longshoring operations,' and 'harborworker.' The latter are lesser included examples of 'maritime employment.' Thus the terms 'maritime employment' and 'longshoring' cannot be synonyms. The Act on its face clearly suggests that there are jobs which may not constitute longshoring operations but which are 'maritime employment.'[3]
 
 
 49
 Because of their professed inability to discern the meaning of 'maritime employment' and 'longshoring operations,' the majority feels driven to legislative history.[4] With all deference, I think they give up too easily. The Congress is entitled to have its words accorded meaning if it is at all possible to do so, and I think it is. There are guidelines and aids for statutory construction and interpretation which, it seems to me, the majority overlooks in its rush to the committee reports.
 
 
 50
 A. In the first place, the 1972 amendments to the Act are of a remedial nature, designed to correct inequities worked by the Act prior to its amendments. With this in mind, we should be guided by a uniform line of cases holding that the Longshoremen's and Harborworkers' Compensation Act should be liberally construed in light of its remedial nature and humanitarian purposes. See, e.g., Reed v. Steamship Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), rehearing denied, 375 U.S. 872, 84 S.Ct. 27, 11 L.Ed.2d 101 (1963); Voris v. Eikel, 346 U.S. 328, 74 S.Ct. 88, 98 L.Ed. 5 (1953); Pillsbury v. United Engineering Co., 342 U.S. 197, 72 S.Ct. 223, 96 L.Ed. 225 (1951); Nalco Chemical Corp. v. Shea, 419 F.2d 572 (5th Cir. 1969); Calbeck v. A. D. Suderman Stevedoring Co., 290 F.2d 308 (5th Cir. 1961); Old Dominion Stevedoring Corp. v. O'Hearne, 218 F.2d 651 (4th Cir. 1955); Blackwell Construction Co. v. Garrell, 352 F.Supp. 192 (D.D.C.1972); Page Communications Engineers, Inc. v. Arrien, 315 F.Supp. 569 (E.D.Pa.1970); Holland America Insurance Co. v. Rogers, 313 F.Supp. 314 (N.D.Cal.1970); Gibson v. Hughes, 192 F.Supp. 564 (S.D.N.Y.1961). In addition, case law precedent admonishes us to construe doubts, including factual disputes such as are before us in these cases, in favor of the employee or his family. Friend v. Britton, 95 U.S.App.D.C. 139, 220 F.2d 820 (1955), cert. denied, 350 U.S. 836, 76 S.Ct. 72, 100 L.Ed. 745 (1955); Hartford Accident & Indemnity Co. v. Cardillo, 72 App.D.C. 52, 112 F.2d 11 (1940), cert. denied, 310 U.S. 649, 60 S.Ct. 1100, 84 L.Ed. 1415 (1940); Grain Handling Co. v. McManigal, 23 F.Supp. 748 (W.D.N.Y.1938), aff'd 102 F.2d 464 (2 Cir.), cert. denied, 308 U.S. 570, 60 S.Ct. 84, 84 L.Ed. 478 (1939). Finally, 'a narrowly technical and impractical construction' of this chapter is not favored. Luckenbach S.S. Co. v. Norton, 106 F.2d 137, 138 (3d Cir. 1939). Inasmuch as the 1972 amendments were enacted to further the purposes of the original Act, these decisions are still authoritative indications of the proper approach to interpretation of the statute.
 
 
 51
 B. My brothers fail to give sufficient weight, if any, to a presumption created by § 20 of the LHWCA, 33 U.S.C. § 920:
 
 
 52
 § 920. Presumptions
 
 
 53
 In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary--
 
 
 54
 (a) That the claim comes within the provisions of this chapter.
 
 
 55
 Clearly, the statute switches the ordinary burden of proof. I am unable to agree that defendants have sustained their burden by showing by substantial evidence that plaintiffs were not engaged in 'maritime employment.' At most, defendants have offered some evidence as to the nature of plaintiffs' employment. That it may be enough to create a doubt will not defeat the presumption. Doubts are to be resolved in favor of the employee. Friend v. Britton, Cardillo, Grain Handling, supra; Beasley v. O'Hearne, 250 F.Supp. 49 (S.D.W.Va.1966).
 
 
 56
 C. Aside from canons of construction and the special statutory presumption, there is another honored approach enabling a court to accord specific meaning to the words of a statute: 'A consistent and contemporaneous construction of a statute by the agency charged with its enforcement is entitled to great deference by the courts.' NLRB v. Boeing, 412 U.S. 67, 75, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973). This familiar rubric of statutory construction has often found expression in the decisions of this court. E.G., Brennan v. Prince William Hospital, 503 F.2d 282 (4th Cir. 1974) (Secretary of Labor's interpretation of statute entitled to 'great deference'); Tenneco, Inc. v. Public Service Commission, 489 F.2d 334 (4th Cir. 1973) ('This administrative interpretation, while not controlling, is entitled to great weight'); Nacirema Operating Co. v. Oosting, 456 F.2d 956 (4th Cir. 1972) ('we cannot lightly put aside the agency's consistent interpretation of the (LHWCA)').
 
 
 57
 Section 939 of the Act entrusts the overall administration of the statute to the Secretary of Labor, and gives him the authority to 'make such rules and regulations . . . as may be necessary . . ..' Amended § 921 provides for a new method of review of compensation orders whereby disputes as to coverage are first determined by an administrative law judge with right of appeal to the Benefits Review Board. The three Board members are appointed by the Secretary, and their decisions are reviewable by the court of appeals for the circuit where the injury occurred. 33 U.S.C. § 921(b) & (c).
 
 
 58
 I have examined some 32 decisions of the Board rendered from its inception through October 1975 involving the shoreward extension of coverage under the 1972 amendments.[5] I think these decisions of the Board have established a consistent and reasonable interpretation of the Act which should be accorded 'great weight' in this court. The Board is a quasi-judicial body within the agency charged with administration of the Act, and its function is to resolve disputes concerning coverage under the 1972 amendments. Not simply in these three cases, but time and again in an unbroken line of decisions, the Board has found that coverage exists in factually similar cases.
 
 
 59
 Repeatedly and consistently the Board has emphasized:
 
 
 60
 1. Outright rejection of the 'point of rest' theory as a determinative factor in cases where coverage is disputed.
 
 
 61
 2. Waterborne cargo remains in maritime commerce until such time as it is delivered to a trucker or other carrier to be taken from the terminal for further transshipment.
 
 
 62
 3. Cargo first enters maritime commerce when it is unloaded from a truck or other carrier and is handled by terminal employees working upon the 'navigable waters' of the United States as defined in the Act.
 
 
 63
 4. The 'loading and unloading' of ships is a continuous process involving many different employees working at various places within the terminal area and performing different tasks, but includes the handling of cargo during all times it is in maritime commerce.
 
 
 64
 5. It is sufficient to bring an employee within the scope of maritime employment that his duties at the time of injury involve handling cargo that is in maritime commerce.
 
 
 65
 6. The Act does not require that one actually be engaged in loading or unloading vessels to be an 'employee' within the meaning of the Act.
 
 
 66
 I think we should hesitate to reject out of hand the expertise of the Board, and should instead accord its consistent interpretations of the statute 'great deference.'[6]
 
 
 67
 D. Before the 1972 amendments, § 921(b) of the LHWCA provided that review of compensation orders be had in the federal district courts. Although the scope of review was not defined by statute, the cases soon made clear that the district courts' inquiry was 'strictly limited.' Mid-Gulf Stevedores, Inc. v. Neuman, 333 F.Supp. 430, 431 (E.D.La.1971), reversed on other grounds, 462 F.2d 185 (5th Cir. 1972). See also O'Keeffe v. Smith, Hinchman and Grylls Associates, Inc., 380 U.S. 359, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965). Rulings by the district court could, of course, be appealed to the circuit court of appeals, but the scope of review there was also very narrow. O'Loughlin v. Parker, 163 F.2d 1011 (4th Cir. 1947) ('. . . it is . . . undisputed that the compensation order below must be accepted by us if it has warrant in the record and a reasonable basis in law.').
 
 
 68
 The Benefits Review Board now performs essentially the same function as did the district courts prior to the Act's amendment. One significant difference, however, is that the scope of the Board's review is expressly defined by statute: 'The findings of fact in the decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole.' 33 U.S.C. § 921(b)(3). Section 921(c) provides that appeals from the Board may be taken to the court of appeals or the circuit where the injury occurred. Significantly, the scope of review in the circuit courts is not defined, limited, or expanded by the 1972 amendments. I should think, therefore, that the same narrow review exercised by this court prior to 1972 remains the proper standard of review on appeal today. Cardillo v. Liberty Mut. Ins. Co., 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947); Wheatley v. Adler, 132 U.S.App.D.C. 177, 407 F.2d 307 (1968); Wolff v. Britton, 117 U.S.App.D.C. 209, 328 F.2d 181 (1964); O'Loughlin v. Parker, supra; Groom v. Cardillo, 73 App.D.C. 358, 119 F.2d 697 (1941).
 
 
 69
 My point is that the majority has failed to heed the restricted scope of review which the cases require of us. In all three cases here on appeal, the administrative law judge found coverage under the Act. In each case the Benefits Review Board, bound by its 'substantial evidence' standard, affirmed. The majority opinion reverses, and this, I submit, is error. The record as a whole leaves no doubt in my mind that the decisions of the administrative law judge and the Benefits Review Board have 'warrant in the record and a reasonable basis in law.' O'Longhlin v. Parker, supra. I would, on this basis alone, vote to affirm.
 
 III.
 
 70
 The basic disagreement between myself and my brothers is whether or not resort to the legislative history was necessary at all in these cases. My brothers feel that the language of the 1972 amendments is ambiguous, and they accordingly embark upon their search for congressional purpose and intent citing as authority United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961). I find no such ambiguity and note that the operative sentence in the Oregon case cited by my brethren reads as follows: 'Having concluded that the provisions of (the statute) are clear and unequivocal on their face, we find no need to resort to the legislative history of the Act.' 366 U.S. at 648, 81 S.Ct. at 1281. In taking such a position, I find reassurance in case law precedent in this circuit. United States v. Deluxe Cleaners & Laundry, Inc., 511 F.2d 926 (4th Cir. 1975) (not permissible for court to assume that Congress by inadvertence failed to state something other than what is plainly set forth in statute); United States v. Snider, 502 F.2d 645 (4th Cir. 1974) ('Congress is presumed to have used words according to their ordinary meaning, unless a different signification is clearly indicated.'); United States v. Erdos, 474 F.2d 157 (4th Cir. 1973) ('Where the power of the Congress is clear, and the language of exercise is broad, we perceive no duty to construe a statute narrowly.'); United States v. Hunter, 459 F.2d 205 (4th Cir. 1972) ('Legislative intent is first to be gathered from the plain meaning of the words of the statute.'); Vroon v. Templin, 278 F.2d 345 (4th Cir. 1960) ('The language of the statute is plain and is to be taken as written.'); Aiken Mills, Inc. v. United States, 144 F.2d 23 (4th Cir. 1944) ('. . . where the language of the statute is clear and needs no interpretation we may not look to the legislative history . . ..'). Missel v. Overnight Motor Transp. Co., 126 F.2d 98 (4th Cir. 1942) ('Normally the best evidence of congressional purpose is the language of the law itself.'); Inland Waterways Corp. v. Atlantic Coast Line R. Co., 112 F.2d 753 (4th Cir. 1940) ('Other parts of the same act, or the debates in Congress, during the passage of the statute, can throw no light on that which is already made plain by the words used in the statute itself.').
 
 
 71
 It is the term 'maritime employment' which troubles the majority. For reasons discussed infra, I do not find the term ambiguous, but would instead hold that it has an established meaning sufficiently broad and inclusive to cover these three plaintiffs.
 
 
 72
 In summary, I would first hold that resort to the legislative history is unnecessary and would affirm on the basis of the plain language of the statute. Secondly, even if it is assumed arguendo that the statute is ambiguous, there are: (A) an established rule of statutory construction, (B) a statutory presumption, (C) administrative interpretations of the Act, and (D) a narrow and restricted scope of review in this court, all of which should control our disposition of this case and which, in my view, require affirmance. The majority fails to consider these factors, and in doing so commits error.
 
 IV.
 
 73
 In all candor, I must confess that my objections to the majority's resort to legislative history might have been somewhat mollified had the prize been worth the hunt. Despite close examination of the background of the LHWCA and the 1972 amendments in Part IV of the majority opinion, however, my brothers are unable to produce any statement of congressional intent which conclusively resolves the matters here in issue. Indeed, contrasted to the straightforward language of amended § 902(3), the phrasing of the House Report relied upon by the majority is to me virtually useless as a guide to who is covered and who is not.[7]
 
 
 74
 The sentence in the House Report thought crucial by the majority reads as follows: 'Thus, employees whose responsibility is only to pick up stored cargo for further transshipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo.' U.S.Code Cong. & Admin. News 1972, p. 4708. I think they read more into the sentence than is there. In the first place, over-the-road and local truck drivers who come to a terminal to pick up cargo for further transshipment would certainly not be covered for several reasons: (a) ordinarily they are at the outer perimeter of the terminal and not on 'navigable water,'[8] (b) usually truck drivers, certainly if unionized, never load their trucks; they only drive them. The sentence from the House Report is inartful, and seems to mean that neither clerical workers nor truck drivers picking up shipments are covered and for the same reason: neither category of workers have anything to do with the loading or unloading of cargo. The wording in the House Report just quoted cannot be so broadly construed so as to exclude from coverage those workers who (1) work on the 'navigable waters' and (2) must directly handle cargo in the overall process of loading and unloading ships.
 
 
 75
 I think it is clear that the legislative history standing alone cannot support the majority position. At best, the House Report matches its own ambiguity against that of the statute. The majority opinion makes sense only when the legislative history is paired with the 'point of rest' theory, a concept which appears nowhere in the legislative history or the statute, and one which, I predict, will confound and perplex this court for years to come.
 
 
 76
 According to the majority, waterborne cargo leaves the chain of maritime commerce when it is taken off the ship and lowered to its 'point of rest.' Likewise, cargo enters maritime commerce when it is picked up from its 'point of rest' and loaded onto the ship. Waterfront employees who handle cargo on the landward side of this point would thus not be covered by the Act, for their service would not be 'maritime employment.' On the other hand, as this same cargo passes through the 'point of rest' seaward, it somehow undergoes a qualitative metamorphosis, acquiring maritime characteristics; employees who handle the cargo on that side of the point are engaged in 'maritime employment' and are covered by the Act. Thus, the location of the 'point of rest' is crucial.
 
 
 77
 The majority relies upon two preamendment definitions urged upon the court by appellants in their briefs. The Norfolk Marine Terminal Association Tariff (Item 290) defines the term thus:
 
 
 78
 The term 'point of rest' means a point within a Terminal where the terminal operator designates that cargo or equipment be placed for movement to or from a vessel.
 
 
 79
 Federal Maritime Commission Regulations, 46 C.F.R. § 533.6(c), refer to the point as follows:
 
 
 80
 '(P)oint of rest' shall be defined as that area on the Terminal facility which is assigned for the receipt of inbound cargo from the ship and from which inbound cargo may be delivered to the consignee, and that area which is assigned for the receipt of out-bound cargo from shippers for vessel loading.
 
 In addition, the FMC has noted:
 
 81
 The handing of cargo by a Terminal operator is (t)he service of physically moving cargo between the point of rest and any place on the Terminal facility other than the end of the ship's tackle. 46 C.F.R. Section 533.6(d)(6).
 
 
 82
 Where in the Act or its legislative history is there any suggestion that the Congress meant for us to 'read into' the statute the proposition that 'maritime employment' exists only on the seaward side of this 'point of rest' as defined in these pre-amendment regulations? If Congress, as appellants claim, meant to embrace the concept of the 'point of rest' as a demarcation line between 'maritime' and 'nonmaritime' employment, why was this 'generally understood' doctrine not explicitly written into § 902(3) of the Act, defining 'employee', or at the very least, mentioned in the legislative reports? Surely a concept of such alleged widespread use and application is too conspicuous by its absence to be read into the statute. This court has no license to find in a statute words which the Congress did not put there.
 
 
 83
 'Statutory explication may be an art, but it must not be artful.' United States v. Parker, 376 F.2d 402 (5th Cir. 1967). '(O)ne sentence in a Senate Report is not controlling where both houses of Congress have passed a bill containing unambiguous language to the contrary.' Abell v. Spencer, 96 U.S.App.D.C. 268, 225 F.2d 568 (1955). '(W)e know of no authority for the substitution of the language of a Committee Report for that of the statute to which it relates.' Wodehouse v. Commissioner of Internal Revenue, 166 F.2d 986 (4th Cir. 1948).
 
 
 84
 A survey of legal commentary on the 1972 amendments[9] reveals only one instance where the point of rest theory was discussed,[10] although shoreside extension of coverage was an issue considered by every writer.
 
 
 85
 That the 'point of rest' theory attracts so little support from legal scholars suggests to me their awareness that its application would destroy congressional purpose and emasculate the administration of the Act. Counsel for appellants have conceded, both in their briefs and in oral argument, that the location of the 'point of rest' will vary from port to port, depending upon the sophistication of each port's cargo-handling facilities. The definitions relied upon by the majority, moreover, would grant to the terminal operator power to shift unilaterally the 'point of rest' seaward or shoreward at his whim or caprice.
 
 
 86
 If the 'point of rest' theory remains wedged between the lines of the LHWCA, the result can only be to erect yet another 'situs' requirement for coverage. Once the initial 'situs' test is satisfied, i.e., it is determined that a worker is injured on 'navigable waters' as defined by the Act, the only remaining inquiry should be whether his employment is 'maritime.' A worker's 'status,' i.e., whether he is engaged in maritime employment, should be determined by the nature of his work, and not where he performs it. Yet, the 'point of rest' theory, adopted by the majority, means that workers performing the same function, handling the same cargo, will be treated differently depending upon where they work, even though they are all working on the premises of a terminal conceded to be within the Act's definition of 'navigable waters.' It was precisely this anomaly, where workers exposed to identical risks receive disparate workmen's compensation benefits, which provided the impetus for the 1972 amendments.[11] Thus, the majority effectively holds that the Congress has failed in its efforts to correct a bad situation, and that coverage even yet depends upon a fictional location--point of rest--that has no relation whatever to the inherent risks of employment.
 
 
 87
 All three plaintiffs in these appeals were required to handle ship's cargo while on the navigable waters of the United States. The risks incident to such hazardous employment resulted in unfortunate injury to all three. I believe the LHWCA covers each one, and that Congress intended just such a result.
 
 V.
 
 88
 I am convinced that Adkins, Brown and Harris are 'employees' covered by the Act, whether the nature of their employment is termed 'maritime,' 'longshoring,' 'harborworker,' or 'loading and unloading.' It is clear, however, that 'maritime employment' is the broadest of the terms, while 'loading and unloading' is the narrowest and the most indisputably 'maritime.' Accordingly, while I prefer not to quibble over labels, I feel it important to demonstrate that there is ample case law precedent for the proposition that all three plaintiffs were engaged in 'loading and unloading'[12] ships, an occupation which is inherent in the work of longshoremen, who, in turn, are defined by the Act to be in 'maritime employment' and thus are covered 'employees.'
 
 
 89
 Most of the cases[13] describing the 'loading and unloading' of ships involve attempts by longshoremen to assert a cause of action in admiralty against a shipowner for injuries sustained in ship's service.
 
 
 90
 In Litwinowicz v. Weyerhaeuser S.S. Co., 179 F.Supp. 812 (W.D.Pa.1959), plaintiff was injured as steel beams were being loaded into a vessel. Plaintiff's job was to prepare the beams for unloading from a railroad car on the pier so that they could be then loaded into the ship. This work was performed on land and inside the railroad car. In holding for the plaintiff, the court remarked:
 
 
 91
 The term loading is not a word of art, and is not to be narrowly and hypertechnically interpreted. Plaintiffs' actions at the time of the accident were direct, necessary steps in the physical transfer of the steel from the railroad car into the vessel, which constituted the work of loading.
 
 
 92
 179 F.Supp. at 817--18. The court expressly rejected the defense contention that plaintiff was merely preparing the cargo for loading, and was therefore not actually engaged in loading the ship.
 
 
 93
 In Hagans v. Ellerman & Bucknall S.S. Co., 318 F.2d 563 (3d Cir. 1963), bags of sand were unloaded from a ship in canvas slings. The bags were placed upon a four-wheeled flatbed truck; then a tow motor vehicle was hooked to the truck and pulled it into a large warehouse building some distance from the ship's berth. After the truck arrived inside the warehouse, plaintiff's job was to lift off bags of sand and stack them five-high on the floor of the warehouse. Plaintiff slipped on loose sand on the warehouse floor and was injured. The defense claimed that plaintiff was merely stacking bags for purposes of transshipment, an argument which has a familiar ring in the context of the cases here on appeal. The court, in rejecting this argument, held:
 
 
 94
 He was unloading bags of sand from the motor towed trucks and placing them in their first immobile resting place ashore. They were the same bags handled by his fellow longshoremen who had started the process of discharge of the cargo in the hold of the vessel. The pier apron could not contain the large number of bags which, in any event, had to be protected from the weather, by being placed within the pier building. The conclusion is inescapable that Hagans performed an integral part of the unloading of the vessel and thus as a matter of law he was in the ship's service.[14]
 
 
 95
 318 F.2d at 571.
 
 
 96
 In Thompson v. Calmar S.S. Corp., 331 F.2d 657 (3d Cir. 1964), the problem again involved loading steel from freight cars into a ship. In order to bring a particular freight car into position for unloading, it was necessary to 'bump' it into position using other freight cars pulled by the ship's winch. Plaintiff was stationed at the brake of the car to be unloaded. The impact of the other cars striking the one upon which plaintiff was standing catapulted him across the track where his left leg was amputated by the wheels of the railroad car. The court had no difficulty finding that plaintiff was engaged in the process of loading a ship, although he was not even handling cargo at the time of his injury.
 
 
 97
 In Spann v. Lauritzen, 344 F.2d 204 (3d Cir. 1965), nitrate powder was being unloaded from a ship by crane and dropped into a hopper on the pier. As trucks drove under the hopper, plaintiff would discharge nitrate into the waiting trucks by pulling a heavy bar or handle. A malfunction of the handle caused plaintiff's injuries. The question on appeal was whether plaintiff was unloading a ship or merely loading a truck for further transshipment. Citing Hagans, Calmar, and Litwinowicz, supra, the court held plaintiff was engaged in 'unloading' a ship, and was 'no less so because modern ingenuity suggested the desirability of combining the unloading of the vessel with the loading of the trucks. . . . The labor saving method here used which facilitated the removal of the cargo by motor vehicles may not be held to eliminate the unloading of the cargo from the area of traditional work of the seamen in the service of the vessel.' 344 F.2d at 206.
 
 
 98
 In Olvera v. Michalos, 307 F.Supp. 9 (S.D.Tex.1968), plaintiff was using a power shovel to pick up corn from a railroad car and move it into a warehouse, from which it was then loaded into a ship's hold. The district court refused a defense motion for summary judgment on plaintiff's personal injury claims on the grounds that plaintiff could possibly prove that his work was 'an essential part of the loading process.' 307 F.Supp. at 11.
 
 
 99
 In Byrd v. American Export Isbrandtsen Lines, Inc., 300 F.Supp. 1207 (E.D.Pa.1969), plaintiff was attempting to move cargo from the back of the pier into a position on the front of the pier for loading onto a ship. Plaintiff was injured while operating a forklift truck for this purpose. In holding that plaintiff was 'essentially engaged in a loading operation,' 300 F.Supp. at 1208, the court relied upon Litwinowicz, supra, and declared that 'defendant unduly delimits the term 'loading' to the actual transfer of the cargo from the front of the pier to the vessel.' 300 F.Supp. at 1208.
 
 
 100
 The plaintiff in Chagois v. Lykes S.S. Co., 432 F.2d 388 (5th Cir. 1970), was standing inside a boxcar operating an auger which facilitated the even flow of rice out of the railroad car. Rice flowed from the railroad car into a shore-based hopper and was thence loaded in bulk into the hold of a waiting vessel. Plaintiff was injured operating the auger. In holding that plaintiff was engaged in loading a ship, the court held that 'his work . . . was an essential part of an unbroken sequence of moving the rice from the pier to the ship.' 432 F.2d at 391.
 
 
 101
 A very important case is Law v. Victory Carriers, Inc., 432 F.2d 376 (5th Cir. 1970). Plaintiff in this case had various waterfront duties. On the day of his accident he was driving a forklift on the dock. Plaintiff would take the cargo from one point on the pier to another point closer to the ship. He was injured during this process.
 
 
 102
 The court first considered the minority view of 'loading' ships. 'One approach . . . is to define 'loading' in an exceedingly narrow and mechanical fashion, limiting it to those activities which begin with the physical act of lifting the cargo onto the vessel.' 432 F.2d at 380. The court cited as illustrative of this doctrine Drumgold v. Plovba, 260 F.Supp. 983 (E.D.Va.1966). The court then noted that 'the more prevalent view, however, is found in cases which define the terms 'loading' and 'unloading' in a more pragmatic and less ritualistic sense.' 432 F.2d at 383.
 
 The court concluded:
 
 103
 We choose to align ourselves with the cases which define 'loading' and 'unloading' in a realistic sense rather than as hypertechnical terms of art. . . . He was part of a group of longshoremen who were engaged in the total operation of moving cargo from the dock to the vessel. . . . The efforts of both the ship-side workers and the shore-side workers were necessary to load the ship. . . . Law's activities had proximity to and continuity with the job at hand--the task of loading cargo aboard the (ship). His specific job performance was so integrally woven into the entire loading operation that the two cannot be separated except by the erection of hypertechnical and unrealistic legal barriers. If the terms . . . are to be terms associated with reality rather than mere conceptual microcosms without adjuncts beyond the ship's beam, we have no choice but to conclude that the plaintiff Law was engaged in loading the (ship). 432 F.2d at 384--85.[15]
 
 
 104
 In McNeil v. Havbor, 326 F.Supp. 226 (E.D.Pa.1971), plaintiff's job was to operate a 'squeeze lift' truck within the confines of a warehouse or pier shed. His job was to lift and transfer cases from pallets owned by one company to pallets owned by the defendant. The plaintiff never went aboard a vessel, and his function was simply to move cargo from one pallet to another inside the pier shed. Plaintiff was injured due to some defect in the truck. The court stated:
 
 
 105
 Defendant asks that we characterize libellant's job as a mere transfer of materials from the place on the pier warehouse to another place within the warehouse. . . . We cannot subscribe to . . . the narrow characterization urged by defendant. The more prevalent view which is well supported by authoritative case law is to define the term loading in a realistic, pragmatic and non-ritualistic manner.
 
 
 106
 326 F.Supp. at 228.
 
 The court states the rule thus:
 
 107
 Where the conduct in question is a direct and necessary step in the loading operation and where the equipment being used is necessary for that purpose, libellant must realistically be considered as engaged in the loading process of the vessel for the purposes of unseaworthiness.
 
 
 108
 326 F.Supp. at 229.
 
 The court also noted that:
 
 109
 (B)ecause the work was done by three separate longshoring gangs in three integrated steps does not make the entire operation any less a loading operation. . . . In a realistic sense, the loading process must begin somewhere. We hold, on the present record, that it at least begins when the intended cargo in the pier shed begins its movement towards the ship. We consider it a strained analysis that the process of loading may only be characterized as the actual physical lifting of the cargo into the ship's hold.
 
 
 110
 326 F.Supp. at 229.
 
 
 111
 Garrett v. Gutzeit, 491 F.2d 228 (4th Cir. 1974), is a Fourth Circuit case secided in 1974. The factual situation involved unloading bales of paper from a ship. The cargo was removed from the ship and set down on the pier where other members of the longshoring gang then moved the bales one at a time on hand trucks into a pier shed. As they arrived in the shed, plaintiff's job was to take the cargo off the hand trucks and stack the bales four-high. The court noted that 'the cargo was transferred from the pier apron and stacked in the shed to facilitate the removal of more bales from the hold.' 491 F.2d at 230. When one of the metal bands encasing the cargo snapped, the plaintiff was injured.
 
 The court held:
 
 112
 The (district) court apparently concluded that 'unloading' ceases when the cargo is no longer in contact with the ship, i.e., when the bales were deposited on the pier and discharged from the ship's gear. Although we find this theory appealing because of its ease of application, we believe that the case law rejects such a narrow definition of 'unloading.'
 
 
 113
 491 F.2d at 234.
 
 
 114
 The case is also important because it apparently rejects the narrow definition of 'loading and unloading' set forth in Drumgold, supra, 260 F.Supp. 983. The court first noted the district court's reference to its prior decision in the Drumgold case, and held:
 
 
 115
 We, however, are guided by the historical development of the warranty rather than by arbitrary definitions of admittedly amorphous terms. . . . The record in the instant case demonstrates that it was necessary to move the bales away from the side of the ship as they were discharged from the ship's gear so that additional bales could be unloaded. It was, therefore, a 'necessary step in the unloading operation.'
 
 
 116
 491 F.2d at 236.
 
 
 117
 The Gutzeit case is important to this appeal because it aligns this circuit with the view that 'loading and unloading' are not 'words of art' and ought rather to be given a 'realistic' meaning.
 
 
 118
 The only realistic conclusion in this appeal is that Brown, Harris, and Adkins were all engaged in the overall process of loading and unloading ships. Donald Brown was a forklift operator employed to pick up cargo inside a warehouse and load it into large containers which, when sealed, would be placed aboard a ship. Vernie Lee Harris was a hustler driver who moved containers 'stuffed' with cargo from a long term storage lot to a marshaling area adjacent to the pier. Adkins operated a forklift truck inside a pier shed, and would pick up cargo recently 'stripped' from containers and load these pallets into trucks for shipment to the ultimate consignee. All three worked on terminal premises, i.e., on 'navigable waters.' All three were required to subject themselves to the risks inherent in moving and handling cargo and in operating the potentially dangerous machinery of the trade. All three were injured as the direct result of the hazards of such employment. In my opinion, these three plaintiffs were injured in the process of loading or unloading a ship while upon navigable waters. The plain language of the statute requires no more (and indeed, less) than this, and neither should this court. But if I am wrong, and these plaintiffs were not engaged in longshoring work, surely they must be found to have been engaged in maritime employment--the generic term--or else it seems to me the Congress has legislated in vain.
 
 
 119
 I dissent.
 
 
 
 [1]
 The 1972 Amendments to §§ 2 and 3 were only part of a broad overhaul of the Act. Other amendments substantially increased the maximum and minimum benefits which could be awarded; accomplished a legislative overruling of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), which permitted a longshoreman to recover damages from a ship resulting from the ship's unseaworthiness; and effected a legislative overruling of Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), under which a ship could recoup from a longshoreman's employer the damages it was required to pay the longshoreman for injuries he suffered due to the unseaworthiness of the ship, on the theory that the employer breached an express or implied warranty of workmanlike performance
 
 
 [2]
 It was not until the decision in Calbeck v. Travelers Ins. Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962), that the availability of the Act's remedies for all injuries to employees on navigable waters was firmly established. Pre-1927 cases had tried to afford some protection to injured maritime employees by whittling down the Jensen doctrine with the so-called 'maritime but local' exception, which allowed the application of state law to admittedly maritime accidents in areas of 'local concern.' See, e.g., Grant Smith-Porter Ship Co. v. Rohde, 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321 (1922); Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210 (1921). After the passage of the 1927 Act, it was unclear whether these decisions persisted as a limit on the federal law's scope. Calbeck made it plain that they did not. What did survive was a sphere of concurrent state and federal jurisdiction, the so-called 'twilight zone.' This was the area where it was impossible to predict, before litigation, whether the employee's activities were so local that a state workmen's compensation act might apply. See, e.g., Hahn v. Ross Island Sand & Gravel Co., 358 U.S. 272, 79 S.Ct. 266, 3 L.Ed.2d 292 (1959); Davis v. Department of Labor and Industries, 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246 (1942)
 For a description of the genesis of the Act and the principal judicial constructions of it, see dissenting opinion of Haynsworth, C.J., in Marine Stevedoring Corp. v. Oosting, 398 F.2d 900, 910--11 (4 Cir. 1968), rev'd sub nom. Nacirema Operating Co. v. Johnson, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969).
 
 
 [3]
 The present Act, insofar as longshoremen and ship builders and repairmen are concerned, covers only injuries which occur 'upon the navigable waters of the United States.' Thus, coverage of the present Act stops at the water's edge; injuries occurring on land are covered by State Workmen's Compensation laws. The result is a disparity in benefits payable for death or disability for the same type of injury depending on which side of the water's edge and in which State the accident occurs
 It is apparent that if the Federal benefit structure embodied in Committee bill is enacted, there would be a substantial disparity in benefits payable to a permanently disabled longshoreman, depending on which side of the water's edge the accident occurred, if State laws are permitted to continue to apply to injuries occurring on land. It is also to be noted that with the advent of modern cargohandling techniques, such as containerization and the use of LASH-type vessels, more of the longshoreman's work is performed on land than heretofore.
 The Committee believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. Accordingly, the bill would amend the Act to provide coverage of longshoremen, harbor workers, ship repairmen, ship builders, shipbreakers, and other employees engaged in maritime employment (excluding masters and members of the crew of a vessel) if the injury occurred either upon the navigable waters of the United States or any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other area adjoining such navigable waters customarily used by an employer in loading, unloading, repairing, or building a vessel.
 The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only to pick up stored cargo for further trans-shipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo. However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment. Likewise the Committee has no intention of extending coverage under the Act to individuals who are not employed by a person who is an employer, i.e. a person at least some of whose employees are engaged, in whole or in part in some form of maritime employment. Thus, an individual employed by a person none of whose employees work, in whole or in part, on navigable waters, is not covered even if injured on a pier adjoining navigable waters.
 
 
 [4]
 We are aware that Adkins testified that in the past, and sometimes over weekends, he was employed in various capacities 'loading and unloading ships' and 'on a ship.' We think that the record is clear, however, that Adkins was not so employed at the time that he was injured; rather his duties were confined to operating a forklift in Shed 11. As we have indicated in the text, the status of his employment is to be determined as of the time of the accident--not by what his previous duties may have been or by what his duties are when he accepts sporadic overtime assignments
 
 
 [1]
 See generally 1A Benedict on Admiralty §§ 15--30 (7th ed. 1973, Supp. October 1975); Gorman, The Longshoremen's and Harbor Workers' Compensation Act--After the 1972 Amendments, 6 J.Maritime L. & Commerce 1 (1974); Gorman, The Longshoremen's Act After the 1972 Amendments, 20 Practical Lawyer 13 (1974); Comment, Broadened Coverage Under the LHWCA, 33 La.L.Rev. 683 (1973); Comment, The Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972: An End to Circular Liability and Seaworthiness in Return for Modern Benefits, 27 U.Miami L.Rev. 94 (1972); Note, Maritime Jurisdiction and Longshoremen's Remedies, 1973 Wash.U.L.Q. 649 (1973); Note, Admiralty--the 1972 Amendments to § 903 of the Longshoremen's and Harbor Workers' Act: Has the 'Twilight Zone' Moved Onto the Pier?, 4 Rutgers-Camden L.J. 404 (1973); Note, Admiralty--Maritime Personal Injury and Death-- Longshoremen's and Harbor Workers' Act Amendments of 1972, 47 Tulane L.Rev. 1151 (1973)
 
 
 [2]
 On the basis that there can be nothing more maritime than the sea, every employment on the sea or other navigable waters should be considered as maritime employment. . . . (I)t would be well to adopt a criterion which takes into account the undoubted jurisdiction of admiralty in matters of all injuries on navigable waters
 1A Benedict on Admiralty, supra note 1 at § 17 (emphasis added). In this context, note the greatly expanded definition of 'navigable waters' contained in the 1972 amendments as set forth on page 1083 of the majority opinion.
 
 
 [3]
 There is, apparently, some confusion about this. Appellants consistently take the position that an employee can be covered only if he engages in traditional longshoring operations. ('. . . Congress in extending the coverage of the Act shoreward was concerned only with those workers commonly known as longshoremen . . .. Clearly Congress did not intend that the Act as amended would apply to workers who during the course of their duties are not required to go on board ship . . ..' Brief for Petitioners Maritime Terminals, Inc. and Aetna Casualty and Surety Co. at 19). See, e.g., Vickery, Some Impacts of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, XLI Ins. Counsel J. 63, 67 (1974) ('The employee must be engaged in 'longshoring operations' . . ..'). While for purposes of this appeal I do not find it necessary to go beyond the question of whether these three plaintiffs were engaged as longshoremen, I do point out that to equate maritime employment with longshoring operations denies meaning to the broader term chosen by the Congress
 Indeed, it seems correct to hold that even the term 'harborworker' is broader and more generic than 'longshoremen,' and that longshoremen are but a category of harborworkers.
 First in the catalogue of harbor workers is the longshoreman. The longshoreman, as the name implies, is a shoreside worker whose principle activity is the loading and unloading of ship's cargo.
 Outside of cargo work in the holds, longshoremen are engaged in various tasks in connection with voyage preparation or termination. The work may consist of carrying ship's stores or passenger's baggage aboard ship. Or the work may be performed entirely on the pier in the handling of mechanical equipment, or the storing, moving, or loading of goods on the dock.
 M. Norris, 1 The Law of Maritime Injuries § 3 (3d ed. 1975). (Emphasis added.)
 
 
 [4]
 Because we conclude that the terms 'maritime employment,' 'longshoreman' and 'longshoring operations' are not such words of art that we would be justified in deciding the case without resort to the legislative history of the 1972 Amendments and full consideration of the context in which they were enacted, we turn to these secondary sources
 Maj.Op. p. 1084.
 
 
 [5]
 Dellaventura v. Pittston Stevedoring Corp., 2 BRBS 340 (Oct. 9, 1975); Lopez v. Atlantic Container Lines, Ltd., 2 BRBS 265 (Sept. 9, 1975); Shoemaker v. Schiavone & Sons, Inc., 2 BRBS 257 (Sept. 5, 1975); Batista v. Atlantic Container Lines, Ltd., 2 BRBS 193 (Aug. 22, 1975); Spataro v. Pittston Stevedoring Corp., 2 BRBS 122 (Aug. 8, 1975); Stockman v. John T. Clark & Son of Boston, 2 BRBS 99 (July 30, 1975), appeal docketed, No. 75--1360 (1st Cir., filed Sept. 24, 1975); Johns v. Sea-Land Service, Inc., 2 BRBS 65 (July 11, 1975), appeal docketed, No. 75--2039 (3d Cir., filed Sept. 9, 1975); Mildenberger v. Cargill, Inc., 2 BRBS 51 (July 3, 1975); Watson v. John T. Clark & Son of Boston, Inc., 2 BRBS 47 (July 2, 1975); Richardson v. Great Lakes Storage and Contracting Co., 2 BRBS 31 (June 26, 1975), appeal docketed, No. 75--1786 (7th Cir., filed Aug. 25, 1975); Skipper v. Jacksonville Shipyards, Inc., 1 BRBS 533 (June 11, 1975), appeal docketed, No. 75--2833 (5th Cir., filed July 11, 1975); Cappelluti v. Sea-Land Service, Inc., 1 BRBS 527 (June 10, 1975), appeal docketed, No. 75--1801 (3d Cir., filed July 23, 1975); Vinciquerra v. Transocean Gateway Corp., 1 BRBS 523 (June 5, 1975); Powell v. Cargill, Inc., 1 BRBS 503 (May 30, 1975); appeal docketed, No. 75--2655 (9th Cir., filed July 28, 1975); O'Leary v. Southeast Stevedore Co., 1 BRBS 498 (May 30, 1975); Nulty v. Halter Marine Fabricators, Inc., 1 BRBS 437 (May 2, 1975), appeal docketed, No. 75--2317 (5th Cir., filed May 20, 1975); Scalmato v. Northeast Marine Terminals, Co., 1 BRBS 461 (May 7, 1975); Mininni v. Pittston Stevedoring Corp., 1 BRBS 428 (May 1, 1975); DiSomma v. John W. McGrath Corp., 1 BRBS 433 (April 30, 1975); Ford v. P. C. Pfeiffer Co., Inc., 1 BRBS 367 (March 21, 1975), appeal docketed, No. 75--2289 (5th Cir., briefs filed Oct. 2, 1975); Mason v. Old Dominion Stevedoring Corp., 1 BRBS 357 (March 21, 1975); Ronan v. Maret School, Inc., 1 BRBS 348 (March 10, 1975), appeal docketed, No. 75--1445 (D.C. Cir., filed May 5, 1975); Kelley v. Handcor, Inc., 1 BRBS 319 (Feb. 28, 1975), appeal docketed, No. 75--1943 (9th Cir., filed April 28, 1975); Harris v. Maritime Terminals, Inc., 1 BRBS 301 (Feb. 3, 1975), appeal docketed, No. 75--1196 (4th Cir., oral argument Aug. 21, 1975); Perdue v. Jacksonville Shipyards, Inc., 1 BRBS 297 (Jan. 31, 1975), appeal docketed, No. 75--1659 (5th Cir., briefs filed June 4, 1975); Herron v. Brady-Hamilton Stevedore Co., 1 BRBS 273 (Jan. 23, 1974), appeal docketed, No. 75--1538 (9th Cir., filed March 7, 1975); Ryan v. McKie Co., 1 BRBS 221 (Dec. 10, 1974); Brown v. Maritime Terminals, Inc., 1 BRBS 212 (Dec. 6, 1974); appeal docketed, No. 75--1075 (4th Cir., oral argument Aug. 21, 1975); Coppolino v. International Terminal Operating Co., Inc., 1 BRBS 205 (Dec. 2, 1974); Adkins v. I.T.O. Corporation of Baltimore, 1 BRBS 199 (Nov. 29, 1974), appeal docketed, No. 75--1051 and No. 75--1088 (4th Cir., oral argument Aug. 21, 1975); Gilmore v. Weyerhaeuser Co., 1 BRBS 180 (Nov. 12, 1974), appeal docketed, No. 74--3384 (9th Cir., oral argument Oct. 17, 1975); Avvento v. Hellenic Lines, Ltd., 1 BRBS 174 (Nov. 12, 1974)
 
 
 [6]
 It has become clear that the position taken by the Board with respect to the scope of coverage under the amended Act reflects at least the initial position of the Secretary of Labor
 At 20 C.F.R. Part 710, the Department of Labor issued proposed guidelines for coverage under the LHWCA as amended. Section 710.4(b) states:
 Based on procedures normally utilized in the maritime industry, the loading process may include certain terminal activities which are incidental to the placement of cargo on the vessel. Conversely, the unloading process may also include certain terminal activities. Terminal activities to be included in coverage under the amended Act are employees engaged in loading or unloading break-bulk, containerized or Lash ships and lighters, or passenger ships. Activities which may be covered include employees engaged in stuffing and stripping of containers, employees working in and about marine railways, and other employees engaged in processing water-borne cargo.
 (Emphasis added.)
 These proposed guidelines are now under study by the Department, and thus do not as yet represent the official view of the Department of Labor. Yet they are useful in ascertaining the Department's initial interpretation of the statute in light of the consistent position taken by the Benefits Review Board.
 
 
 [7]
 See footnote 3 of the majority opinion, supra
 
 
 [8]
 Section 903(a), reproduced at page 1083 of the majority opinion, supra
 
 
 [9]
 See authorities cited in footnote 1, supra
 
 
 [10]
 Vickery, supra note 4 at 68. In the introductory paragraph to Mr. Vickery's article it is stated that he worked 'extensively' with the Congress as a representative of several maritime and steamship associations in drafting the 1972 amendments. Yet I note again that the 'point of rest' theory which, he insists, is a part of the statute is nowhere to be found in the Act nor is it mentioned in the legislative history
 
 
 [11]
 Nacirema Operating Co. v. Johnson, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969); Note, 1973 Wash.U.L.Q., supra note 1 at 666
 
 
 [12]
 See, e.g., Gorman, 20 Practical Lawyer, supra note 1 at 18 ('. . . the test for coverage is whether the employee is 'directly involved' in loading, unloading, repairing or building a vessel. There is bound to be litigation that will outline in a case-by-case basis the tests to determine coverage of employees injured in adjoining areas.'); Note, 1973 Wash.U.L.Q., supra note 1 at 670; Note, 4 Rutgers-Camden L.J., supra note 1 at 410--412
 
 
 [13]
 Although the Act has been amended, prior cases defining the scope of 'maritime employment' and 'loading and unloading' are still useful in determining who is covered under the 1972 amendments and who is not. 1A Benedict, supra note 1 at § 18
 
 
 [14]
 The term 'first immobile resting place ashore' suggests an awareness by the court of the point of rest theory. Yet note that this was not the determinative factor considered by the court in reaching its ultimate conclusion. Rather, the court emphasized the nature of the plaintiff's job and stressed the fact that plaintiff was required to handle the cargo
 
 
 [15]
 The Supreme Court reversed this opinion of the Fifth Circuit in Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), but on grounds which had nothing to do with the Fifth Circuit's approach to 'loading and unloading.' The Supreme Court reversed as to liability, holding that state workmen's compensation laws applied since the LHWCA could only apply within the reach of federal admiralty jurisdiction, i.e., on the 'navigable waters' of the United States. This opinion inspired in part the effort to amend the LHWCA so as to include certain shorebased facilities within the definition of 'navigable waters.'
 The Supreme Court did not reverse the Fifth Circuit on the ground that it had incorrectly determined that Law was engaged in loading the ship. Indeed, this is made explicitly clear in footnote 14 of the opinion, 404 U.S. at 214, 92 S.Ct. 418. There the Supreme Court held that limiting coverage under the LHWCA to work performed on 'navigable waters' would make it unnecessary for the Court to become involved in the dispute over what is and is not 'loading and unloading.' Id.
 Since the reversal was not grounded in the Fifth Circuit's definition of loading and unloading, I think that such an approach is still a proper one, and would suggest that this circuit has in fact adopted this view in the Gutzeit case, discussed infra.