INTERCONTINENTAL CONTAINER
TRANSPORT CORPORATION,
Plaintiff-Appellee,

v.

NEW YORK SHIPPING ASSOCIATION,
Inc. and International Longshoremen's
Association, Defendants-Appellants.

Nos. 803–804, Dockets 34758–34779.

United States Court of Appeals,
Second Circuit.

Argued April 29, 1970.

Decided June 5, 1970.

Constantine P. Lambos, New York City (Lorenz, Finn & Giardino, New York City, on the brief), for appellant New York Shipping Assn., Inc.

Thomas W. Gleason, New York City (Gleason & Miller, New York City, on the brief), for appellant International Longshoremen's Assn.

Samuel Gewirtz, New York City (Zwerling & Zwerling, New York City, on the brief), for appellee.

Before HAYS, ANDERSON and FEINBERG, Circuit Judges.

HAYS, Circuit Judge:

This is an appeal from an order of the United States District Court for the Southern District of New York granting a preliminary injunction in an action for a declaratory judgment, an injunction and treble damages for violation of the Sherman Act. We hold that the district court's grant of the preliminary injunction was not justified and therefore reverse its order.

The plaintiff Intercontinental Container Transport Corporation (ICTC) is engaged in the business of assembling ships' cargo and packing it into containers and in receiving containers, unpacking them and forwarding the contents to the various consignees. As incidental to its container operation ICTC warehouses the goods it handles.

There are two defendants, the New York Shipping Association (NYSA) and the International Longshoremen's Association (ILA). NYSA is an association of steamship carriers engaged in transporting passengers and freight between the Port of New York and other ports. It admits to associate membership, stevedores and certain other employers of longshore labor who carry on the work of loading and unloading ships at piers in the Port of New York. ILA is a labor union certified to represent

among others, the employees of steamship companies and stevedores who load and unload ships' cargoes.

NYSA as the agent for its members negotiates with ILA for collective agreements which cover the wages, hours and other working conditions of the longshore employees. The present agreement is the General Cargo Agreement effective from October 1, 1968 to September 30, 1971.

The controversy that we are called upon to resolve involves certain provisions of the agreement between NYSA and ILA pertaining to the use of containers. Historically the work of longshoremen included the preparation of cargo for shipment by making up, for example, drafts and pallets and, in connection with unloading cargo, the breaking up of drafts and pallets, sorting the cargo according to its consignees and delivering it to the trucks or other carriers. In recent years the practice of packing cargo into very large receptacles called containers has rapidly increased and a number of businesses, of which ICTC is one, have been set up which have as their function the assembling of cargo and packing it into containers, and receiving and unpacking containers and forwarding the contents to the consignees. The result of this "containerization" has been a marked reduction in the demand for longshore labor.

The General Cargo Agreement provides in substance that longshoremen employed on the docks and piers by members of NYSA are to perform the work of "stuffing and stripping," i. e., of packing and unpacking containers, where the contents of the containers are composed of the goods of more than one shipper and where the containers come from or go to points within 50 miles of the Port of New York. The steamship carrier must pay to the union welfare fund "liquidated damages" in the amount of $250 for each container covered by the Agreement which has been loaded

or unloaded without being stuffed or stripped on the dock by ILA members.

ICTC's complaint in the present action alleges that NYSA and ILA have entered into a combination and conspiracy to exclude all persons except members of NYSA from engaging in the business of stuffing and stripping containers in the Port of New York and that in furtherance of this combination and conspiracy fines have been levied on members of NYSA who have handled containers stuffed or stripped by plaintiff, and other members of NYSA have been warned that they would be similarly fined if they dealt with plaintiff. Alleging that these activities of NYSA and ILA are violative of the Sherman Act, ICTC seeks a declaratory judgment, an injunction and treble damages of $1,500,000.

The district court granted plaintiff a preliminary injunction restraining defendants from taking any action to induce anyone to refrain from using plaintiff's services in stuffing or stripping containers or from handling containers stuffed or stripped by plaintiff.

Appellants contend that the injunction was improperly granted because (1) the plaintiff has little possibility of success at the trial; (2) the action is barred by *res judicata;* (3) the exclusive jurisdiction of the subject matter lies with the National Labor Relations Board; (4) the case is governed by the Norris LaGuardia Act;[1] and (5) the injury to defendants from the granting of the injunction would be substantially greater than the injury plaintiff would suffer if the injunction were denied.

Although we agree that the preliminary injunction should not have been granted, we do so only on the first of the grounds advanced by appellants, that is, that there is little possibility of plaintiff's succeeding at trial. In view of this determination it is unnecessary for us to reach the fifth contention, that concerning comparison of the injury resulting to the parties from granting or

---

1 This point is raised by ILA but not by NYSA.

denying the injunction, since this contention relates only to the preliminary injunction. However, because the other grounds of appeal go to the basis for the district court's acting on the matter at all, we record briefly our view that the contentions are not supportable.

The claim of *res judicata* relates to a previous action brought by plaintiff against NYSA alone. In that action, in which the complaint was dismissed on the ground of preemption under the National Labor Relations Act, no claim was made of any combination or conspiracy between NYSA and ILA which was not a party. The ruling of the court that issues raised in the first action were within the exclusive jurisdiction of the National Labor Relations Board is clearly not determinative of whether in an action based on different allegations and seeking an entirely different remedy, the court must defer to the Board.

The independent claim of preemption for this Sherman Act case is equally erroneous. Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965).

The Norris LaGuardia Act does not insulate the conduct alleged by the plaintiff from liability under the Sherman Act. Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); Los Angeles Meat & Provision Drivers Union v. United States, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed. 2d 150 (1962).

A preliminary injunction "will not be granted except upon a clear showing of probable success * * *" Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); Clairol Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir. 1968); Société Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, 299 F.2d 33, 35 (2d Cir. 1962). We hold that in the present case plaintiff failed to make the required showing.

The test of whether labor union action is or is not within the prohibitions of the Sherman Act is (1) whether the action is in the union's self-interest in an area which is a proper subject of union concern and (2) whether the union is acting in combination with a group of employers. United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); Allen Bradley Co. v. Local 3, *supra.*

That the ILA in taking the position it did with respect to containerization was acting in its self-interest, i. e., in the interest of its members,[2] is readily apparent. The provisions of the collective agreement have as their object the preservation of work traditionally performed by longshoremen covered by the agreement.

The Supreme Court has repeatedly held that the preservation of jobs is within the area of proper union concern. See, for example, National Woodwork Mfg. Assoc. v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 204–215, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); Order of Railroad Telegraphers v. Chicago and Northwestern R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960). Union activity having as its object the preservation of jobs for union members is not violative of the anti-trust laws. Amal-

2. As long as the union's action is intended to serve the interests of its members it is no proper concern of the courts whether the action is that best adapted to suit its purpose. "So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit * * * are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." United States v. Hutcheson, 312 U.S. 219, 232, 61 S.Ct. at 466 (1941) (footnote omitted). See also Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 697–735, 85 S.Ct. 1596 (1965) (opinion of Mr. Justice Goldberg).

gamated Meat Cutters v. Jewel Tea Co., *supra*; United States v. International Hod Carriers, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508 (1941), affirming United States v. Carrozzo, 37 F.Supp. 191 (N.D. Ill.1941).

The evidence submitted to the district court in connection with the application for a preliminary injunction does not persuade us of the probability of the plaintiff's success in establishing that the containerization provisions of the collective agreement were the product of the kind of combination between Union and employers that is condemned in Allen Bradley Co. v. Local Union 3, *supra*. In *Allen Bradley* the Court found that the collective agreement there involved "did not stand alone. It was but one element in a far larger program in which contractors and manufacturers united with one another to monopolize all the business in New York City, to bar all other business men from that area, and to charge the public prices above a competitive level." *Id.*, 325 U.S. at 809, 65 S.Ct. at 1540. The union, the Court held, "aid[ed] and abet[ted] business men to do the precise things which [the Sherman] Act prohibits." *Id.* at 801, 65 S.Ct. at 1536.

In our case it appears that containerization has for many years been a bitterly contested issue in the negotiations between ILA and NYSA. In the course of the controversy preceding the execution of the collective agreement now in force, a Taft-Hartley 80-day injunction was granted and the Board of Inquiry set up in connection with that injunction stated in its report to the President that containerization was the "most urgent item" of difference between the parties. The containerization provisions of the agreement were finally settled

upon only after another strike of 56 days. These provisions represent a compromise under which NYSA agreed to a guaranteed annual wage at a cost during the first year alone of approximately $8,000,000 in return for ILA's giving up its demand that its members stuff and strip all containers and acceding to the provisions for a fifty mile limit and for not stuffing and stripping containers containing the goods of a single shipper. Thus it appears that, far from aiding and abetting a violation of the Sherman Act by a group of business men, the union here, acting solely in its own self-interest, forced reluctant employers to yield to certain of its demands. Under these circumstances the resulting agreement is within the protection of the labor exemption to the antitrust laws. Amalgamated Meat Cutters v. Jewel Tea Co., *supra*.

Plaintiff seeks to avoid the effect of applying to the present situation the principles we have stated by arguing that (1) plaintiff has sought and been refused admission to NYSA, although stevedores who do the same work as plaintiff are permitted to become members, (2) its employees who would perform the stuffing and stripping operation are members of ILA.

Even assuming arguendo that if plaintiff does the same work as members of NYSA it would be entitled to admission to that organization,[3] it appears from the evidence submitted in the district court that plaintiff's business is not only entirely different from the business of the members of NYSA who operate steamships but that in fact there is only a small part of plaintiff's business which bears even a superficial similarity to the work done by stevedores. Plaintiff is engaged in the business of assembling

3. See to the contrary Sebastian v. Quarter Century Club of the United States Shoe Machinery Corp., 327 Mass. 178, 179, 97 N.E.2d 412, 413 (1951); Cline v. Insurance Exchange of Houston, 140 Tex. 175, 166 S.W.2d 677 (1942); American Live-Stock Commission Co. v. Chicago Live-Stock Exchange, 143 Ill. 210, 32 N.E. 274 (1892); Barazani v. Brighton and Manhattan Beach Chambers of Commerce and Civil Assoc., 20 Misc.2d 844, 194 N.Y.S. 2d 426 (Sup.Ct. Kings Co. 1959); Gold Knob Outdoor Advertising Co. v. Outdoor Advertising Ass'n, 225 S.W.2d 645 (Tex. Civ.App.1949).

and forwarding, receiving and distributing and warehousing ships' cargo at a warehouse which happens in plaintiff's case to be conveniently close to the docks but which could as readily be located at an inland point. It is licensed by the Waterfront Commission to engage in the "warehousing and consolidation of freight." Its license "does not allow the performing of regular stevedoring services." The work of stevedores is the loading and unloading of ships. The only resemblance between the work done by consolidators of cargo, like the plaintiff, and the stevedore members of NY SA is that a small part of the operation of both groups consists of packing and unpacking containers, albeit in warehouses located anywhere in the case of consolidators and at the docks in the case of stevedores. This limited similarity hardly seems to justify a claim that the two types of firms, performing quite different economic functions, are to be forced into the same trade association.

The fact that plaintiff employs members of ILA is irrelevant. Members of ILA are employed in several different types of industry including factories and warehouses. These members are of course not covered by the General Cargo Agreement and do not work for members of NYSA. Plaintiff's ILA employees receive the same wages as employees who are paid under the General Cargo Agreement but in other respects working conditions are very different. They are not beneficiaries of the seniority system in effect on the docks and it is difficult to see how they could be incorporated into that system. Plaintiff's employees do not have the protection of the guaranteed annual wage as do the employees coming under the General Cargo Agreement and we understand plaintiff to concede that it would be unable to afford to give its employees that assurance.

Finally, as appellants point out, plaintiff would not gain any advantage if it were admitted to NYSA and operated under the General Cargo Agreement. Its

containers would still have to be stuffed and stripped by the workers engaged in loading and unloading cargo, since the purpose of the containerization provisions is to preserve for those ILA members who are employed on the docks this aspect of their traditional work. Stuffing and stripping by ILA members in plaintiff's warehouse would not satisfy the requirements of the General Cargo Agreement.

For the reasons stated we reverse the district court, vacate the preliminary injunction and remand the case for further proceedings not inconsistent with this opinion.

ANDERSON, Circuit Judge (concurring):

I concur in the judgment reversing and vacating the preliminary injunction, because Intercontinental Container Transport Corp. has not made the required showing of probable success in proving that the appellants' actions were motivated by anticompetitive employer interests rather than the union's goal of job preservation. National Woodwork Manufacturers Assoc. v. NLRB, 386 U.S. 612, 87 S.Ct. 1250 (1967); Amalgamated Meat Cutters v. Jewel Tea Co., Inc., 381 U.S. 676 (1965); Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533 (1945).

The New York Shipping Association, Inc., contains both a group of steamship carriers, which are its only full members, and a second group of "associate members." The latter category includes not just employers engaged in the loading or unloading of ships, but others involved in "activities related to pier or ship operations and employing waterfront employees * * *" NYSA By-Laws, § 1(b). Some of the associate members are stevedores, with whom operators of container stations, such as the plaintiff, seek to compete. The plaintiff's antitrust theory is essentially that influential stevedores among the associate members have combined with the International Longshoremen's Association and used NYSA machinery to penalize steamship

carriers—themselves the full members of the NYSA—who deal with ICTC or other container station operators.

As the result of a contract reached after a lengthy strike, the ILA has now agreed that its members will handle containers, on the terms and conditions spelled out in the General Cargo Agreement between itself and the NYSA. ICTC contends that it is willing to conform to the substance of all these conditions, so that union members' jobs and working conditions will not be jeopardized; but it complains that the union nevertheless has helped the NYSA employers to prevent it from doing so solely in order to protect the stevedores from container station competition.

ICTC alleges that it is willing to hire ILA "deep-sea" labor, at the rates and under the conditions specified in the General Cargo Agreement, to stuff and strip containers in a warehouse facility actually located on a dock in the Port of New York.[1] The ILA has refused to negotiate an appropriate contract with ICTC, partly because that firm allegedly cannot provide full compliance with General Cargo Agreement provisions governing a guaranteed annual wage and seniority until it gains membership in NYSA.[2] The employers' association, in turn, has rejected ICTC's application for membership because it has never before included container station operators, who have not traditionally been a feature of the waterfront scene, in its rather loosely-defined associate member category.

The district court accepted the appellants' argument that the General Cargo Agreement's containerization rules, requiring that ILA deep-sea labor service the containers for a specified wage, are valid union-promoted work preservation measures. But it held, both initially and in a second opinion after reargument, that their enforcement to exclude ICTC from joining the employers' association and complying with the rules might constitute an element of a "scheme to restrain competition." In effect, it concluded that there could be no proper job preservation motive for what appeared to be the union's refusal to handle the containers of all employers on equal terms, nor any justification based on mere precedent for a monopolization of waterfront container servicing by the members of a closed employers' organization.

The district court erred, however, in viewing the complaint as setting out a clear dichotomy between work preservation rules which are valid as written and

---

1. When this action was commenced, ICTC was leasing a 52,000 square foot facility, described as "Shed 195 E and F," located at Export St., Port Newark, N. J. The district court found that this building was "within two blocks of the waterfront on a marine terminal complex," which placed it "on" a "waterfront terminal" as that phrase is defined in the Waterfront Commission Act, 32 N.J.S.A. 23–6; ch. 202, Part I, § 1, art. II [1953] N.J.Acts 1513. Subsequently ICTC relocated at 839 River Rd., Edgewater, N. J., where it leased a 30,000 square foot facility which the district court characterized as "directly on the waterfront." At argument, the present container station was described as "on" a dock; but it has never been alleged to be a site at which ships currently are loaded or discharged.

2. It is not clear whether NYSA membership alone would be sufficient to enable ICTC to satisfy the ILA on these matters. The union's arguments vary from asser-

tions that it will not negotiate with ICTC because that firm is not in the NYSA to contentions that the appellee would not be able to offer the requisite wage and seniority terms even if admitted. ICTC represents that it has previously employed ILA deep-sea longshoremen "at the rates provided by the NYSA-ILA settlement terms," and there is no record of its unwillingness to negotiate a contract offering the General Cargo Agreement guaranteed wage or some satisfactory equivalent. The ILA also argues that longshoremen employed under an otherwise appropriate contract with ICTC would retain their industry-wide seniority but lose non-transferable seniority status at specific piers where they had formerly worked; yet no reason has been offered why a given container station might not be considered by the union as itself the equivalent of a new pier, or an adjunct of one near which it is located, for such subsidiary seniority purposes.

their improper use to exclude an employer willing to comply with their substance. In at least one significant aspect, ICTC failed to offer ILA members employment on terms which would comply with the General Cargo Agreement even if membership in NYSA were available. The containerization rules as written specify that stuffing and stripping of containers must be done by ILA deepsea labor *at waterfront piers and docks.*[3] A key element in the appellants' argument is the contention that ICTC's container station, even if physically located near or on a former dock, is still largely an isolated warehouse which does not provide the range of peripheral job opportunities for longshoremen which are available when the same work is done at full-scale piers or docks where ships are loaded and discharged. If a substantial amount of stripping and stuffing is diverted to separate container stations where activity is not continuous, the ILA could well anticipate that parts of existing piers or docks would be closed down, with a net loss of longshoremen's jobs. If this is the case, union work preservation motives may have inspired both the ILA's refusal to negotiate a deep-sea labor contract with ICTC and the NYSA's subsequent refusal to open its doors to an employer whose operations do not take place at traditional piers or docks.

Since ICTC has suggested no way in which its evidence will overcome this argument,[4] the probability of success required for the granting of a preliminary injunction is lacking.

**3.** This fact is obscured somewhat by the agreement's failure to adopt a uniform phrase to describe longshoremen's existing work locations. Rule 2 requires that all stuffing and stripping take place "on a waterfront facility, pier or dock," while Rule 3(d) modifies this to "waterfront facility (pier or dock)," and Rule 3(e) refers only to a "waterfront facility." The preamble to the Rules on Containers, on the other hand, mentions the preservation of longshoremen's work jurisdiction "at deepsea piers or terminals." In any case, these repeated references to the preservation of jobs at specific locations suggest the need for a more complete factual inquiry concerning the nature and site of ICTC's container station facility. Rule 3(d), which distinguishes the keeping of records for all containers supplied to consolidators such as ICTC from rec-

ord-keeping at a "waterfront facility (pier or dock)," seems at least to imply that the parties did not contemplate that the activities of a consolidator would be carried on at a traditional longshoremen's work location.

**4.** ICTC relies upon the district court's finding that no reason appears for any distinction between work sites on a "waterfront terminal" as defined in the Waterfront Commission Act, see note 1, *supra*, and those designated by the containerization rules' references to a "waterfront facility." But a location inside a terminal area, which need only be *within 1,000 yards of* a "pier * * * used for waterborne freight," might be vastly different from the actual pier or dock facility itself, at which the ILA has sought to preserve jobs.