23-795-cv
Drabinsky v. Actors' Equity Association

# United States Court of Appeals
# For the Second Circuit

August Term, 2023

(Argued: December 5, 2023          Decided: July 2, 2024)

Docket No. 23-795-cv

_____

GARTH DRABINSKY,

*Plaintiff-Appellant,*

v.

ACTORS' EQUITY ASSOCIATION,

*Defendant-Appellee.*

_____

Before:

SACK, LOHIER, and KAHN, *Circuit Judges*.

Broadway producer Garth Drabinsky alleges that the union representing theater actors and state managers unlawfully boycotted, defamed, and harassed him during his production of the musical *Paradise Square*. Drabinsky brought antitrust claims and New York state tort claims against the union. The United States District Court for the Southern District of New York (Schofield, *J.*) held that Drabinsky's antitrust claims were barred by the statutory labor exemption derived from the Clayton Antitrust Act of 1914 and the Norris-LaGuardia Act of 1932, and that his tort claims were barred under *Martin v. Curran*, 303 N.Y. 276 (1951). We **AFFIRM**.

LUKE HASSKAMP, Bona Law PC (Jarod Bona, Bona Law
        PC, La Jolla, CA; Molly Donovan, Bona Law PC,
        New York, NY; Aaron Gott, Bona Law PC,
        Minneapolis, MN; Richard Alan Roth, The Roth
        Law Firm, PLLC, New York, NY; Joshua D.
        Wright, Lodestar Law & Economics, PLLC,
        McLean, VA, *on the brief*), La Jolla, CA, *for
        Plaintiff-Appellant*.

JEFFREY L. KESSLER, Winston & Strawn LLP (David L.
        Greenspan, Winston & Strawn LLP, New York,
        NY; Evan Hudson-Plush, Cohen, Weiss and
        Simon LLP, New York, NY, *on the brief*), New
        York, NY, *for Defendant-Appellee*.

Andrew Lyubarsky, Matthew Ginsburg,
        American Federation of Labor and Congress of
        Industrial Organizations (AFL-CIO), Washington,
        DC, *for Amicus Curiae AFL-CIO in support of
        Defendant-Appellee.*

LOHIER, *Circuit Judge*:

The Sherman Antitrust Act of 1890 prohibits contracts, combinations, and

conspiracies "in restraint of trade," as well as monopolies over trade.  15 U.S.C.

§§ 1, 2.  In the years following the Act's passage, the Supreme Court repeatedly

enjoined union activity as an unlawful restraint of trade.  *See, e.g., Loewe v. Lawlor*,

208 U.S. 274, 304–05 (1908); *see also Duplex Printing Press Co. v. Deering*, 254 U.S.

443, 484–85 (1921) (Brandeis, *J.*, dissenting).  Prompted by labor unions to

respond, Congress enacted the Clayton Antitrust Act in 1914 and the Norris-

2

LaGuardia Act in 1932 "to immunize labor unions and labor disputes from challenge under the Sherman Act" and exempt them from sure ruin under the guise of antitrust law enforcement. *H.A. Artists & Assocs. v. Actors' Equity Ass'n*, 451 U.S. 704, 713 (1981). The principal and until now unresolved question in this appeal is whether an antitrust plaintiff suing a union bears the burden of proving that the statutory labor exemption does not apply, or whether the union must raise the exemption as an affirmative defense. We conclude that the plaintiff bears the burden of proving (and therefore must plead) that the exemption does not apply.

The union in this case, Actors' Equity Association ("Equity"), represents over 50,000 theater actors and stage managers. The plaintiff, Broadway producer Garth Drabinsky, alleges that Equity organized an illegal boycott that ousted him from the business of producing live shows. Drabinsky claims that Equity violated the Sherman Act and various state laws, including defamation. The United States District Court for the Southern District of New York (Schofield, *J.*) dismissed Drabinsky's complaint (the "Complaint") under Federal Rule of Civil Procedure 12(b)(6). As most relevant to this appeal, it held that Equity's conduct

3

was exempt from antitrust liability under the Sherman Act. We agree and therefore affirm.

## BACKGROUND[1]

*Paradise Square*, a Broadway musical, explores racial conflict and the calamitous 1863 Civil War race riots in New York City. The show, originally conceived a decade ago, was produced by Drabinsky, a Tony Award-winning producer whose previous hits include *Ragtime* and a 1994 revival of *Show Boat*. From the start, Drabinsky's *Paradise Square* production was marred by conflict. Cast members complained bitterly about Drabinsky's management, his repeated displays of racial insensitivity, unpaid wages, and safety concerns on the set. Equity, which represents the cast members, responded by spreading rumors about Drabinsky to its members and to the Broadway League, the trade association for theater producers. Equity also instituted a one-day work stoppage, exposing Drabinsky to even more negative attention and press. Equity ultimately placed Drabinsky on its "Do Not Work" list in order to discourage

---

[1] The following facts are drawn from the Complaint and assumed to be true for purposes of our *de novo* review of the District Court's judgment dismissing the Complaint for failure to state a claim upon which relief can be granted. *Schlosser v. Kwak*, 16 F.4th 1078, 1080 (2d Cir. 2021).

4

Equity's members and members of its four "sister" unions (representing television, radio, concert, and film performers) from working with him.

Drabinsky originally sued Equity in federal court under state law based on diversity jurisdiction, claiming that the union engaged in an unlawful campaign of defamation and harassment. Equity countered that the District Court lacked subject-matter jurisdiction over the case under 28 U.S.C. § 1332 because complete diversity between the parties was lacking. Drabinsky amended his complaint to add federal antitrust claims, which he now acknowledges were intended to invoke the District Court's federal-question jurisdiction. Equity moved to dismiss the amended complaint for failure to state a claim. The District Court granted the motion with prejudice, holding that Equity's conduct was exempt from antitrust liability under the statutory labor exemption derived from the Clayton and Norris-LaGuardia Acts. And Drabinsky's state claims, the District Court determined, were barred under New York law because he failed to allege that Equity's members had individually ratified Equity's allegedly unlawful conduct.

This appeal followed. The American Federation of Labor and Congress of Industrial Organizations (popularly known as the "AFL-CIO") filed an amicus

5

brief in support of Equity, urging affirmance of the District Court's holding that the statutory labor exemption bars Drabinsky's antitrust claims.

## DISCUSSION

### I. Federal Antitrust Claims

The Sherman Antitrust Act declares illegal "[e]very contract, combination . . . , or conspiracy, in restraint of trade." 15 U.S.C. § 1. It also penalizes those who "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize any part of . . . trade." 15 U.S.C. § 2. The Act "was largely directed at business monopolies and trade restraints, but it was almost immediately invoked against unions." *Conn. Ironworkers Emps. Ass'n v. New Eng. Reg'l Council of Carpenters*, 869 F.3d 92, 100 (2d Cir. 2017). "Indeed, in the early 1900s, the federal courts" routinely relied on the Act to enjoin union activity and "held unions liable for antitrust violations to nearly the same extent as manufacturers." *Id.*

We have elsewhere described the extended history of Congress's response to the proliferation of injunctions against labor unions, *id.* at 100–02, and see no need to repeat it here. Suffice it to say that

> [t]he basic sources of organized labor's exemption from federal antitrust laws are §§ 6 and 20 of the Clayton Act, [] 15 U.S.C. § 17 and

6

29 U.S.C. § 52, and the Norris-LaGuardia Act, [] 29 U.S.C. §§ 104, 105, and 113. These statutes declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws. [] They do not exempt concerted action or agreements between unions and nonlabor parties.

*Connell Constr. Co. v. Plumbers & Steamfitters Loc. Union No. 100,* 421 U.S. 616, 621–22 (1975) (citing *United States v. Hutcheson,* 312 U.S. 219 (1941), and *Mine Workers v. Pennington,* 381 U.S. 657, 662 (1965)).

Congress adopted the Clayton Act in 1914 and "created the first so-called labor exemption to antitrust scrutiny," *Conn. Ironworkers,* 869 F.3d at 101, "protect[ing] peaceful labor activities from the reach of antitrust laws and limit[ing] the issuance of judicial injunctions in labor disputes," *id.* at 100. Section 6 of the Clayton Act establishes that "[t]he labor of a human being is not a commodity or article of commerce" and exempts from antitrust liability employees who "lawfully carry[] out the legitimate object[ives]" of their union. 15 U.S.C. § 17. Section 20 of the Clayton Act prohibits "injunctions against identified types of union activity," such as strikes and boycotts. *Conn. Ironworkers,* 869 F.3d at 101 (citing 29 U.S.C. § 52); *see also H.A. Artists,* 451 U.S. at 714 (same); *Jou-Jou Designs, Inc. v. Int'l Ladies Garment Workers Union,* 643 F.2d

7

905, 910 (2d Cir. 1981) ("Picketing to obtain a [labor agreement] is protected by the statutory exemption from the anti-trust laws in the Clayton Act . . . .").

When the Supreme Court "narrowly interpreted the anti-injunction provisions in Section 20 of the Clayton Act," Congress reacted by enacting the Norris-LaGuardia Act in 1932, which "clos[ed] the judicially-recognized gaps in the Clayton Act," *Conn. Ironworkers*, 869 F.3d at 101; *see Deering*, 254 U.S. at 473–74; *Hutcheson*, 312 U.S. at 230–31, and "reaffirmed . . . [Congress's] intent to exempt most labor activity from the anti-trust laws," *Jou-Jou Designs*, 643 F.2d at 910. The federal courts have since "mediat[ed] the friction between national antitrust and labor policies" largely by "expand[ing]" rather than contracting the labor exemption.[2] *Conn. Ironworkers*, 869 F.3d at 101.

The statutory exemption has two important limits. "The test of whether labor union action is or is not within the prohibitions of the Sherman Act is (1) whether the action is in the union's self-interest in an area which is a proper subject of union concern and (2) whether the union is acting in combination with

---

[2] Justice Frankfurter memorably described the Norris-LaGuardia Act as "remov[ing] the fetters upon trade union activities, which according to judicial construction § 20 of the Clayton Act had left untouched, by still further narrowing the circumstances under which the federal courts could grant injunctions in labor disputes." *Hutcheson*, 312 U.S. at 231; *see* 29 U.S.C. §§ 101, 104, 105.

8

a group of employers."  *Intercont'l Container Transp. Corp. v. N.Y. Shipping Ass'n*, 426 F.2d 884, 887 (2d Cir. 1970); *see Hutcheson*, 312 U.S. at 232; *Conn. Ironworkers*, 869 F.3d at 102.

With those limits in mind, we turn to the present appeal.  Drabinsky claims that Equity violated Sections 1 and 2 of the Sherman Act by placing him on its "Do Not Work" list and effectively barring him from theater production. Relying on the statutory labor exemption derived from Sections 6 and 20 of the Clayton Act and the Norris-LaGuardia Act, Equity responds that its union activity is broadly immune from suit under the Sherman Act.

We have never specifically addressed which party bears the burden of proof with respect to the statutory labor exemption.[3]  Does the plaintiff bear the burden of showing that the union's conduct is not covered by the exemption, or is it up to the union to establish that the exemption applies?  In answering that question, we bear in mind that "[m]ost immunities are affirmative defenses," *In re Stock Exchs. Options Trading Antitrust Litig.*, 317 F.3d 134, 151 (2d Cir. 2003), and that the burden of proving exceptions to the antitrust laws typically lands on

_____

[3] We have, however, implied that a different type of immunity, the nonstatutory labor exemption, is an affirmative defense for which the union bears the burden of proof.  *See Conn. Ironworkers*, 869 F.3d at 98, 106.

9

defendants, not plaintiffs, *see USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council*, 31 F.3d 800, 805 n.3 (9th Cir. 1994).

But because the statutory labor exemption presumptively protects union activity from the reach of the Sherman Act, *see id.* at 809, we are persuaded that the exemption is not an affirmative defense. Instead, the plaintiff bears the burden of proving that the exemption does not apply. Put another way, a plaintiff must plead at least one of the two limitations to the exemption as an *element* of any claim that the union violated the antitrust laws. *See USS-POSCO Indus.*, 31 F.3d at 805 n.3; *Jou-Jou Designs*, 643 F.2d at 910 (dismissing antitrust complaint that failed to allege that the union conspired with a non-labor group); *see also* 15 U.S.C. § 17 (labor unions and their members presumptively are not "illegal combinations or conspiracies in restraint of trade, under the antitrust laws"). Placing the burden on the plaintiff rather than the union protects the union's conduct from antitrust scrutiny.

In assigning to the plaintiff the burden of proving that the statutory labor exemption does not apply to a union's conduct, we join the Sixth, Seventh, and Ninth Circuits. *See USS-POSCO Indus.*, 31 F.3d at 805 n.3; *Mid-Am. Reg'l Bargaining Ass'n v. Will Cnty. Carpenters Dist. Council*, 675 F.2d 881, 886, 890 n.22

10

(7th Cir. 1982); *James R. Snyder Co. v. Assoc. Gen. Contractors of Am., Detroit Chapter, Inc.*, 677 F.2d 1111, 1118–19, 1121 (6th Cir. 1982). We acknowledge that another sister circuit, the First Circuit, is an outlier on this issue, but this is for understandable reasons. In *American Steel Erectors, Inc. v. Local Union No. 7, International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68 (1st Cir. 2008), the First Circuit appears to have accepted the union's odd concession that the labor exemption constituted an "affirmative defense[] against [the] Plaintiffs' Sherman Act claims." *Id.* at 75. For this reason, it is not at all clear to us that the First Circuit actually addressed the issue before us head on. And if it did, we respectfully decline to follow its lead.

We therefore turn to whether Drabinsky has adequately pleaded that the statutory labor exemption does not apply to Equity's conduct by alleging that Equity was not acting in its self-interest or that Equity combined with non-labor groups. *H.A. Artists*, 451 U.S. at 714. We agree with the District Court that he has failed to do so.

A. Equity Acted in Its Legitimate Self-Interest

A union acts in its self-interest when its conduct is reasonably related to legitimate union goals such as protecting members' wages and working

11

conditions. *Id.* at 718 n.23; *see also Intercont'l Container Transp. Corp.*, 426 F.2d at 887–88 ("Union activity having as its object the preservation of jobs for union members is not violative of the anti-trust laws."); *Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n*, 640 F.2d 1368, 1380 (1st Cir. 1981) ("[T]he labor exemption has been applied when the union acts to protect the wages, hours of employment, or other working conditions of its member-employees, objectives that are at the heart of national labor policy."), *aff'd*, 456 U.S. 212 (1982). Congress has made it easier for us to assess the legitimacy of the union's interest by specifying that certain labor actions, including strikes and boycotts, are presumptively protected from antitrust liability. 29 U.S.C. §§ 52, 104; *see USS-POSCO Indus.*, 31 F.3d at 808–09. More generally, so long as the union's conduct promotes *legitimate* labor goals, it retains the benefit of the labor exemption and remains impervious to antitrust liability based on "any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." *Hutcheson*, 312 U.S. at 232.

The immunity lifts and the labor exemption is lost as soon as the union stops acting in pursuit of its legitimate self-interest and thus "cease[s] to act as [a]

12

labor group[].” *USS-POSCO Indus.*, 31 F.3d at 808 (quoting *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 714 (1982)). We agree with the Ninth Circuit that “[w]hether the interest in question is legitimate depends on whether the ends to be achieved are among the traditional objectives of labor organizations.” *Id.* An obvious example is “if a union is involved in illegal activities unrelated to its mission, such as dealing drugs or gambling, those would not be objectives falling within the union's legitimate interest.” *Id.*

Because Drabinsky challenges Equity's labor boycott — a presumptively protected labor activity — he must make “a very strong showing” that Equity was not acting in its self-interest and so is not entitled to the statutory labor exemption. *Id.* But Drabinsky's Complaint suggests the opposite. Even reading the allegations in the light most favorable to him, Equity engaged in the boycott precisely to protect its members' wages and working conditions. The Complaint alleges, for example, that *Paradise Square* cast members objected to unsafe conditions on set, a racially hostile work environment, and unpaid wages. Equity placed Drabinsky on its “Do Not Work” list only after it heard from its members. It explained that Drabinsky was added to the list because he had

breached the union contract. For these reasons, we think the Complaint itself shows that Equity pursued its legitimate self-interest in placing him on the list.

Drabinsky makes a few arguments in response. First, he describes the cast members' complaints about working conditions and wages as pretextual. But no allegation supports that description. Second, he says that Equity was motivated by personal animus against him. But the Complaint has no factual, non-conclusory allegations that Equity was motivated by an illegitimate purpose in the way that Drabinsky suggests. In any event, a plausible allegation that Equity's actions were prompted by "personal antagonism," without more, is not enough to expose Equity's boycott to antitrust scrutiny. *See Hunt v. Crumboch*, 325 U.S. 821, 824 (1945) (holding that a union did not incur antitrust liability when it refused to work with the petitioner "due to personal antagonism").

Third, Drabinsky contends that even if Equity's "ends are legitimate," we should "also scrutinize whether the means used to achieve them are necessary" because "[t]he means employed by the union bear on the degree of scrutiny we will cast on the legitimacy of the union's interest." Appellant's Br. 31–32 (quoting *USS-POSCO Indus.*, 31 F.3d at 808–09). Here, Drabinsky asks us to consider whether a lifelong boycott that discourages five unions, not just Equity,

14

from working with him genuinely serves Equity's interest. He suggests that the scope of the boycott casts doubt on Equity's claimed objective of protecting the wages and working conditions of the *Paradise Square* cast members. We are not persuaded. The statutory labor exemption contemplates and protects not only a boycott (of whatever duration), but one specifically undertaken in combination with other related unions. *See Hutcheson*, 312 U.S. at 233. For example, the Norris-LaGuardia Act establishes that a "labor dispute" triggering the statutory labor exemption "involves persons who are engaged in the same industry, trade, craft, or occupation; . . . or who are members of the same or an affiliated organization of . . . employees." 29 U.S.C. § 113(a). The alleged scope of Equity's boycott in this case says nothing about Equity's motivations for instituting it and does not itself establish that the boycott is subject to the antitrust laws.

Finally, Drabinsky contends that the boycott does not further Equity's self-interest because he was never the employer for the *Paradise Square* production and thus lacked control over the wages and working conditions of the cast members. We reject this argument for three reasons. As an initial matter, the Complaint, which alleges that Drabinsky controlled various aspects of the production, including hiring, firing, and pay, itself contradicts Drabinsky's

15

argument.  Second, Drabinsky's argument asks us to probe the effectiveness rather than the intent of the union's action.  But "[a]s long as the union's action is intended to serve the interests of its members it is no proper concern of the courts whether the action is that best adapted to suit its purpose."  *Intercont'l Container Transp. Corp.*, 426 F.2d at 887 n.2.  And third, the plain text of the statutory labor exemption makes clear that Drabinsky does not need to serve as the employer of Equity members for Equity's boycott to qualify as protected labor activity.  *See* 29 U.S.C. § 113(c).

For these reasons, we conclude that the Complaint fails to allege that Equity was not acting in its legitimate self-interest when it placed Drabinsky on the "Do Not Work" list.

B.  Equity Did Not Combine with Non-Labor Groups

As explained, a union that combines with a non-labor group to act in restraint of trade forfeits the protection of the statutory labor exemption even when it acts in its legitimate self-interest.  *H.A. Artists*, 451 U.S. at 715; *Intercont'l Container Transp. Corp.*, 426 F.2d at 887.  This limitation ensures that workers and employers do not conspire to monopolize a market and suppress competition.  *See Allen Bradley Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797,

16

809–10 (1945). Here, Drabinsky claims that non-labor groups participated in the boycott, pointing out that some members of Equity and its sister unions are also producers with whom he directly competes. We are not convinced that these are non-labor groups as defined by statute to overcome the statutory labor exemption.

To bring the union outside the statutory labor exemption, Drabinsky must allege that Equity acted in combination with its producer-members *to boycott Drabinsky*. *See Hunt*, 325 U.S at 824 (explaining that if "business competitors conspired and combined *to suppress petitioner's business*," they would be liable under the Sherman Act (emphasis added)). But Drabinsky fails to allege that any producer-members of Equity were involved in placing him on the "Do Not Work" list. At most, Drabinsky alleges that Equity's membership includes unnamed producers who compete with him for work generally. Having failed to allege a more direct connection between Equity's producer-members and the boycott, Drabinsky has inadequately pleaded that the statutory labor exemption does not apply to Equity's conduct in this case. *Cf. Allen Bradley*, 325 U.S. at 799–800 (holding that the defendants were not protected by the statutory labor

17

exemption because the union had combined with contractors and manufacturers *in order to* boycott the plaintiffs' business).

We have another reason to reject Drabinsky's argument. "[A] challenged combination includ[ing] independent contractors or entrepreneurs . . . may come within the statutory exemption if the non-employee parties to the combination are in job or wage competition with the employee parties, or in some other economic interrelationship that substantially affects the legitimate interests of the employees." *Home Box Off., Inc. v. Dirs. Guild of Am., Inc.*, 531 F. Supp. 578, 589 (S.D.N.Y. 1982), *aff'd*, 708 F.2d 95 (2d Cir. 1983) (per curiam); *see Am. Fed. of Musicians of U.S. & Canada v. Carroll*, 391 U.S. 99, 105–07 (1968) (holding that orchestra leaders, who were "deemed to be employers and independent contractors" were in a labor group with orchestra employees because the leaders were in job and wage competition with employees). Here, the producer-members form part of the same "labor group" as the rest of Equity's members because they are also actors or stage managers in wage and job competition with the other members of the union.[4]

---

[4] The Supreme Court in *H.A. Artists* stated that theatrical producers "are plainly a 'non-labor group'" where the labor group is Equity. 451 U.S. at 717 n.21. But the Court recognized that there is an exception "when the employer himself is in job competition

In sum, even the most charitable reading of the Complaint leads us to conclude that the producer-members of Equity constitute part of the "labor group." We accordingly reject Drabinsky's argument that Equity is not entitled to the labor exemption because it combined with a non-labor group.[5]

## II. State-Law Claims

Lastly, we turn to Drabinsky's three state-law tort claims charging Equity with defamation, "intentional tort," and negligence. We agree with the District Court that these claims are barred by *Martin v. Curran*, 303 N.Y. 276 (1951), which requires that a plaintiff seeking to hold a union liable "for tortious wrongs" allege "the individual liability of every single member." *Id.* at 281–82; *see also Palladino v. CNY Centro, Inc.*, 23 N.Y.3d 140, 148–51 (2014) (holding that the *Martin* rule remains good law).

---

with his employees." *Id.* The relationship between Equity's producer-members and its other members fits within this exception because every Equity member is in job and wage competition with other members of Equity.

[5] In his reply brief, for the first time, Drabinsky requested leave to amend his Complaint to add allegations about Equity's combination with a non-labor group and to clarify that Drabinsky was never the employer for *Paradise Square*. Drabinsky abandoned this argument by not raising it in his opening brief, *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005), and he forfeited this argument by not raising it with the District Court, *Green v. Dep't of Educ.*, 16 F.4th 1070, 1078 (2d Cir. 2021).

19

To satisfy *Martin*, Drabinsky must allege the "participation, authorization or ratification" of the challenged conduct by *every* Equity member. *Morrissey v. Nat'l Mar. Union of Am.*, 544 F.2d 19, 33 (2d Cir. 1976). Drabinsky has failed to meet the *Martin* requirement. The Complaint does not allege that all 50,000-plus Equity members participated in, authorized, or ratified either Equity's boycott or its false statements about Drabinsky. Drabinsky asks us to excuse his failure by pointing out that Equity's members delegated decision-making authority to certain small councils and committees that in turn impliedly authorized Equity's actions. But not even the delegated actions of committees and councils can be attributed to all of Equity's members under *Martin*. 303 N.Y. at 279–80; *see Palladino*, 23 N.Y.3d at 148. As a final matter, we note that although *Martin* applies only to intentional torts, *see Torres v. Lacey*, 163 N.Y.S.2d 451 (1st Dep't 1957); *Piniewski v. Panepinto*, 701 N.Y.S.2d 215 (4th Dep't 1999), Drabinsky's negligence claim in substance simply parrots his intentional tort claims. As a

result, that claim is also barred by *Martin*. *See Salemeh v. Toussaint ex rel. Loc. 100 Transp. Workers Union*, 810 N.Y.S.2d 1 (1st Dep't 2006).

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is

**AFFIRMED**.